**Irving and Charlotte RADOL, et al., Plaintiffs,**

v.

**W. Bruce THOMAS, et al., Defendants.**

**No. C–1–82–13.**

United States District Court,
S. D. Ohio, W. D.

March 16, 1982.

---

**42.** *See* Supplemental Order of even date.

Murray Monroe, Cincinnati, Ohio, John L. Strauch, Robert R. Weller, John M. Newman, Jr., Cleveland, Ohio, Richard S. Walinski, Toledo, Ohio, for Hoopman, Barre and Graham.

John W. Beatty, Cincinnati, Ohio, Richard J. Holwell and Richard Reinthaler, White & Case, New York City, William D. Ginn, Cleveland, Ohio, for Thomas, Roesch, Roderick and U. S. Steel Corp.

Charles C. Hileman, III, Schnader, Harrison, Segal & Lewis, Henry T. Reath, Thomas Preston, Duane, Morris & Heckscher, Philadelphia, Pa., David C. Greer, Dayton, Ohio, Ronald S. Rolfe, New York City, for First Boston Corp., et al.

Jacob Stein, Cincinnati, Ohio, David Yardley, Milberg, Weiss, Bershad & Sprectrie, San Diego, Cal., Jerome M. Congress, Melvin I. Weiss, Milberg, Weiss, Bershad & Specthre, New York City, Stanley Chesley, Cincinnati, Ohio, Stanley R. Wolfe, Berger & Montague, P. C., Fred Lowenschuss, Philadelphia, Pa., James W. Schlueter, Cincinnati, Ohio, Daniel W. Krasner, Wolf, Haldenstein Adler, Freeman & Herz, New York City, Greenfield & Chimicles, P. C., Bala Cynwyd, Pa., Harry Nester of Hahn, Loesery, Freedheim, Dean & Weller, Cleveland, Ohio, Stanley Nemser of Wolf, Popper, Ross, Wolf & Jones, Arthur Abbery, New York City, Gene Mesh Co., L.P.A., Cincinnati, Ohio, Jules Brody of Stull, Stull & Brody, New York City, Gallon, Kanzig & Iorio Co., L.P.A., Sheldon Wittenberg, Toledo, Ohio, Kaplan, Kilsheimer & Foley, Pomerantz, Levy, Haudek & Block, New York City, Douglas G. Cole, Cincinnati, Ohio, David S. Cupps, Thomas B. Ridgley, Columbus, Ohio, Stroock, Stroock & Lavan, Reavis & McGrath, Irving Bizar, New York City, Stuart H. Savett, David H. Weinstein and Robert LaRocca, Kohn, Savett, Marion & Graf, P. C., Melvin B. Miller, Ltd., Judah I. Labovitz and Susanna E. Lachs, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, Pa., Tenzer, Greenblatt & Fallon, New York City, for plaintiffs.

## FINDINGS OF FACT, OPINION AND CONCLUSIONS OF LAW

CARL B. RUBIN, Chief Judge.

This matter is before the Court on the Motion for a Preliminary Injunction filed by plaintiffs and upon hearings in this Court on March 2, 3 and 4, 1982 at which testimony and evidence were presented. Plaintiffs sought to enjoin a proposed merger between United States Steel, Inc., a wholly-owned subsidiary of United States Steel (hereinafter U. S. Steel) and Marathon Oil Company (hereinafter Marathon). On March 9, 1982, this Court issued an order denying the plaintiffs' Motion for a Preliminary Injunction, and advised the parties that its Findings of Fact, Opinion and Conclusions of Law would be issued promptly. In accordance with Rule 52 of the Federal Rules of Civil Procedure, the Court does submit herewith its Findings of Fact, Opinion and Conclusions of Law.

### FINDINGS OF FACT

1. The Marathon Oil Company in October of 1981, was a widely held public corporation. It was engaged in the business of extracting oil products, refining them and selling them to consumers. It is known as an "integrated" oil company since it performs the totality of industry functions from exploration to retail sale. As of October 30, 1981, Marathon had approximately 58,685,906 outstanding shares of common stock.

2. On October 30, 1981, the Mobil Corporation announced an offer to purchase up to 40 million of such shares for $85.00 per share in cash. The Directors of Marathon determined to resist the tender offer and took specific action. On the one hand, they retained First Boston Corporation to investigate specific alternatives to the Mobil offer, including the location of potential "white knights." [1] On the other hand, they filed an antitrust suit against Mobil in the United States District Court for the Northern District of Ohio entitled *Marathon Oil Co. v. Mobil Corporation*, 530 F.Supp. 315 [1981–1982 Transfer Binder] (CCH) ¶ 64,379 (N.D.Ohio).

---

1. The term "white knight" refers to an alternative merger partner toward whom a corporation's management is friendly.

3. As early as June of 1981, the management of Marathon determined to prepare itself against the possibility of a hostile takeover. An internal document variously referred to as the "Strong Report" and the "internal asset valuation" (Defs.' Ex. 224, 225) was prepared as an inventory of corporate assets with an estimation of their value. At approximately the same time, the First Boston Corporation was directed to prepare a valuation of Marathon assets based solely upon information available to the public. The Board of Directors was advised of the conclusions reached in both the internal asset valuation and the First Boston Corporation appraisal at a board meeting held on October 31, 1981. During its negotiations with Marathon prior to the actual tender offer, United States Steel was also provided with copies of these reports.

4. The reports contained value estimates of Marathon's proven, probable and possible oil reserves. The values in the two reports varied by billions of dollars. The First Boston Report gave an "asset valuation" of $189 to $226 per share; the Strong Report valued Marathon's assets at $276 to $323 per share. The calculations used in arriving at the values involved factors such as original cost, carrying cost, replacement cost and discount cash flow. The calculations were based on speculations and assumptions which included economic predictions as far as 50 years into the future and projections of the future price of oil. Although the reports were prepared by experts, testimony at the hearing indicated that the methods used in calculating these values were necessarily imprecise and that some of the assumptions and predictions were at best optimistic and at worst inaccurate.

The reports were not prepared in the ordinary course of business. Instead, the evidence indicates that they were intended to be "selling documents" for use in attracting more favorable tender offers.

5. The Board of Directors considered the Mobil offer to be "grossly inadequate" and made a diligent effort to develop an alternative transaction by contacting other corporations potentially interested in acquiring Marathon. During the same period of time, the United States Steel Corporation was seeking to diversify its holdings and considered the acquisition of Marathon among other investments. U. S. Steel apparently initiated the conversations with Marathon after the Mobil offer had been made. Discussions between Marathon and U.S. Steel began on November 9th and resulted in an Agreement of Merger signed on November 18th. The negotiations were carried out at a time when the Mobil tender offer remained open. Approximately 27,900,000 Marathon common shares representing 47% of the total outstanding were eventually tendered into the Mobil account. Amendment No. 14 to Schedule 14D–1 of Mobil Corporation, dated Dec. 1, 1981.

6. The United States Steel tender offer was made public on November 19, 1981. Under the terms of the tender offer, U.S. Steel proposed to pay $125.00 in cash for 30,000,000 or approximately 51.12% of Marathon's outstanding shares. For all other shares, both those tendered and not accepted, and those not tendered, United States Steel proposed a subsequent merger between Marathon and a wholly-owned subsidiary of U. S. Steel whereby each share of Marathon stock would be exchanged for a 12½%, Twelve-year note of U.S. Steel with a face value of $100.[2]

7. Fifty-three million, eight-hundred eighty thousand, three hundred-sixty (53,-880,360) Marathon shares, representing 91.81% of the total outstanding, were tendered in response to U. S. Steel's offer.[3] The second stage of the transaction involves

2. No precise value can be placed on these securities. At the end of 12 years, they will be exchangeable at par. In the meantime, they will fluctuate depending upon interest rates and the relative desirability of the debt securities of United States Steel. At the time of the merger agreement, their value was deemed to be $86.00. It is undisputed that their present value is somewhat less than that.

3. The original period for the U.S. Steel tender offer was extended by the United States Court of Appeals for the Sixth Circuit in *Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 366 [current] Fed.Sec.L.Rep. (CCH) ¶ 98,399 (6th Cir. 1981).

an intention by United States Steel to vote its newly acquired shares in favor of the proposed merger between Marathon and a wholly-owned subsidiary of U.S. Steel, United States Steel, Inc. This required a two-thirds vote of the outstanding shares which was obtained at a shareholder meeting on March 11, 1982. The remaining 49% of Marathon's shares will therefore be exchanged for the debt securities of United States Steel referred to above.

8. Shareholders were first advised of the existence of the internal and First Boston asset valuations in the proxy statement dated February 8, 1982. The proxy statement disclosed the range of net equity values of Marathon per share arrived at by each of the reports, and contained a disclaimer by the Board in each instance as to the reliability and relevance of the reports.[4]

## OPINION

### I. Standard For Injunctive Relief

The standard for consideration of motion for preliminary injunction in this Circuit has been expressed in *Mason County Medical Assn. v. Knebel*, 563 F.2d 256 (6th Cir., 1977). An inquiry concerning the following four standards is required:

1) Whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;

2) Whether the plaintiffs have shown irreparable injury;

3) Whether the issuance of a preliminary injunction would cause substantial harm to others;

4) Whether the public interest would be served by issuing a preliminary injunction.

In that action, Mobil challenged certain options granted to U.S. Steel in the Agreement of Merger. Under the Agreement, U.S. Steel was granted an option to purchase up to 10,000,000 common shares of Marathon for $90.00 per share, and an option to purchase Marathon's interest in the Yates Field for $2.8 billion, if U.S. Steel's tender offer failed and another corporation succeeded in acquiring a majority interest in Marathon. The United States Court of Appeals for the Sixth Circuit invalidated these

To determine the foregoing the Court will consider the various arguments presented.

### II. Allegations Relating to the Tender Offer

### A. Failure to Disclose Material Facts

Plaintiffs allege that Defendants failed to disclose the internal asset valuation by Marathon and the asset valuation by First Boston Corporation at the time of the tender offer. Plaintiffs contend that the asset valuations were "material facts" that would have significantly affected the deliberations of the Marathon shareholders and that the omission of the asset valuations from the tender offer documents violated Section 14(e) of the Williams Act, 15 U.S.C. § 78n(e) (1981) and Section 10(b) and Rule 10b–5 of the Exchange Act, 15 U.S.C. § 78j(b) (1981), 17 C.F.R. § 240.10b–5 (1981).

Defendants assert to the contrary that the tender offer and the documents submitted with it disclosed all material facts that were required by law. Specifically, Defendants contend that the asset valuations were not "material facts" because they could not be calculated to a "substantial certainty", and because the Securities Exchange Commission, (hereinafter "SEC"), Rules prohibited the publication of such highly subjective and unreliable information.

This claim is governed by the following statutes and rule:

15 U.S.C. § 78n(e):

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statement

"lock-up options" under § 14(e) of the Exchange Act. 15 U.S.C. § 78n(e) (1981).

4. Specifically, the Board stated that the reports "were not viewed by Marathon's Board of Directors as being reflective of, and do not represent, per share values that could realistically be expected to be received by Marathon or its shareholders in a negotiated sale of the company as a going concern or through liquidation of the company's assets." (Pltfs.' Ex. I(D) p. 13).

made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purpose of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

15 U.S.C. § 78j(b):

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Promulgated pursuant to 15 U.S.C. § 78j(b) is 17 C.F.R. § 240.10b–5(b):

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality or interstate commerce, or of the mails or of any facility of any national securities exchange.

\* \* \* \* \* \*

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the cir-

cumstances under which they were made, not misleading.

\* \* \* \* \* \*

The Supreme Court has provided guidance in applying these laws by defining "a materially omitted fact" in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976):

An omitted fact is material *if there is a substantial likelihood that a reasonable shareholder would consider it important* .... What the standard does not contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available. (footnote omitted) *Id.* at 449, 96 S.Ct. at 2132. (emphasis added)

In formulating this definition, the Supreme Court recognized that "some information is of such dubious significance that insistence on its disclosure may accomplish more harm than good." *TSC Industries, Inc. v. Northway, Inc., supra* at 448, 96 S.Ct. at 2131. Management's fear of liability should not prompt it to "bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking."[5] *Id.* at 448–449, 96 S.Ct. at 2131–32.

■ Similarly, the definition must accommodate a concern that information containing conclusions which on their face may seem highly significant to a shareholder would, if disclosed, risk misleading the shareholder because the bases for these conclusions are speculative and unreliable.

---

5. Informed decisionmaking by the shareholder is one of the primary objectives of a disclosure statute. *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 448, 96 S.Ct. 2126, 2131, 48 L.Ed.2d 757 (1976). The purpose of the Williams Act was to provide the investor with the *relevant* facts in deciding whether to accept a tender offer. *Piper v. Chris-Craft Industries,* 430 U.S. 1, 27, 97 S.Ct. 926, 942, 51 L.Ed.2d 124 (1977). It "is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without *adequate* information." (emphasis added). *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975).

Thus, an additional requirement that will avoid the risk of making untrue or misleading statements is necessary for the "materiality" definition. That requirement is that the facts or conclusions contained in the information claimed to be "material" can be determined with "substantial certainty". *See James v. Gerber Products Co.*, 587 F.2d 324, 327 (6th Cir. 1978); *Arber v. Essex Wire Corporation*, 490 F.2d 414, 421 (6th Cir. 1974). *See also Kohn v. American Metal Climax, Inc.*, 458 F.2d 255, 265 (3d Cir. 1972); *Dower v. Mosser Industries, Inc.*, 488 F.Supp. 1328, 1339 (E.D.Pa.1980).[6]

In the present record, the evidence indicates that asset valuations contained facts and conclusions that were based on speculations, assumptions and calculations that were imprecise and inaccurate. (Defs.' Ex. 224, 225; Pltfs.' Ex. 1–6, Plaintiffs' Vol. II, 86–115, Vol. II–A, 116–197). Marathon's characterization of these valuations as "selling documents" appears correct. (TR. Vol. I, 127–128). U.S. Steel's almost total disregard of them is probative of their accuracy and significance and hence their materiality. (TR. Vol. III, 23–25). *See, SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 851 (2d Cir. 1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

■ Accordingly, we find that the asset valuations could not be determined with the "substantial certainty" necessary to reach the level of a "material fact". *James v. Gerber Products Co., supra.* Plaintiffs have failed to show a substantial likelihood of success on the merits of this claim.

### B. *Misleading Statements*

Plaintiffs' allege that the fairness opinion expressed in the tender offer documents was misleading because the Marathon Directors falsely implied that they considered the merger independently fair without regard to the tender offer when in fact they considered it fair only by viewing the tender offer and merger as a "unitary transaction". Furthermore, Plaintiffs contend that it was misleading to state that the U. S. Steel tender offer was fair when in fact that fairness opinion was originally predicated on the perceived necessity of a "distress sale" because of the outstanding hostile Mobil offer.

Defendants concede that they viewed and stated that the U. S. Steel tender offer was fair when considered with the merger as a "unitary transaction". However, they deny that their statements were misleading and contend that no significance should be placed on the fact that this view was more explicitly stated in the Proxy statement than in the Tender Offer documents. The Marathon Directors and their financial advisor, First Boston Corporation, had at all times considered the tender offer and the merger interdependent when determining the fairness of Steel's tender offer to Marathon shareholders. Furthermore, Defendants contend that under the facts and circumstances existing at the time of Steel's offer, they gave an accurate and fair evaluation of Steel's tender offer.

The evidence in this case indicates that on Friday, October 30, 1981, a tender offer by Mobil Corporation was made for a minimum of 30 million shares of Marathon stock at $85.00 per share. In an emergency meeting, the Directors of Marathon considered Mobil's offer and what alternatives it had to accepting it and recommending the offer to Marathon shareholders. Based on the presentation and information given to it by its financial advisor, First Boston, the Marathon Directors decided that the Mobil offer was grossly inadequate and that because the Company appeared to be on the "Auction Block", they should seek a better tender offer bid from a "White Knight" (TR. Vol. I, 108–119, 130–131, 134).

With a proration date on the Mobil offer of November 10, 1981, Marathon and First Boston were pressed to find alternative bids. In the process, they approached ap-

---

**6.** This aversion to disclosing speculative and unreliable information is recognized by courts and the SEC under the proxy rules. *See South Coast Services Corp., et al. v. Santa Anna Valley Irrigation Co., et al.*, 669 F.2d 1265 (9th Cir. 1982); *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1292–94 (2nd Cir. 1973).

proximately thirty-five companies. Aside from Steel's bid, their efforts produced proposals from only Allied Industries and Gulf Oil Company. (TR. Vol. I, 136–140). At a subsequent meeting on November 18, 1981, it was determined by Marathon's Board that Allied Industries proposal was not "viable" and that the offer from Gulf Oil Company could present even greater antitrust problems than those that were then being litigated with Mobil. (TR. Vol. I, 148–150). Furthermore, it was determined that liquidation of the Company was not a realistic alternative to Mobil's offer of $85.00 per share due to legal and time constraints. Because Mobil's offer had collected at that time a proration pool of twenty-three to twenty-five million shares by shareholders who were willing to accept $85.00, it was determined that the only way to "combat" Mobil's offer was to seriously consider U.S. Steel's tender offer. (TR. Vol. I, 153–154).

Given the fact that prior to the Mobil offer, Marathon stock had been trading between $60.00 and $70.00 per share, and that if Mobil's offer were successful the Company would be sold for $85.00 per share and if unsuccessful for potentially less, and given the fact that Steel's offer had to be accepted within the day, the Marathon Board decided that Steel's offer should be accepted and recommended to the shareholders. (TR. Vol. I, 155–160, 162–170, 171, 173–174, 183–189, 193).

The evidence also indicates that the tender offer of November 19th stated that the offer and merger were fair to Marathon shareholders. Furthermore, a letter from Director Hoopman refers to the fairness of the tender offer and merger transaction in its first and fourth paragraphs. The letter also refers to the Schedule 14D–9 filed with the SEC in which a shareholder could find the basis for the Board's decision and the alternatives it considered. (Pltfs.' Exhibit 1K, p. 1–2, Pltfs.' Exhibit 1L,)

In light of this evidence, the semantic differences that Plaintiffs point out by comparing the language in the tender offer materials with that of the proxy materials are of no significance in terms of whether or not the fairness opinion on the tender offer was inaccurate or misleading. The opinion in the Tender Offer considered the Tender Offer and Merger fair as a "unitary transaction".

Furthermore, in light of the evidence concerning the events leading up to Marathon's acceptance of Steel's tender offer, this Court concludes that the Marathon Directors acted fairly and that the fairness opinion on the Steel offer was accurate under the circumstances of this case.

### C. Insider Trading

Plaintiffs allege that because the asset valuations were "material facts" and because this information was disclosed to Steel who subsequently purchased Marathon stock, Defendants violated 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5 by trading in Marathon stock based on "inside information".

Because we conclude that Plaintiffs have failed to make a strong showing that the asset valuations were "material facts" that should have been disclosed to Marathon shareholders, we also conclude that Plaintiffs have failed to show a substantial likelihood of success on their claim that Defendants traded stock on inside information in violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b–5. See TSC Industries, Inc. v. Northway, Inc., supra at 445 n.8, 96 S.Ct. at 2130, 2131 n.8; Seaboard World Airlines, Inc. v. Tiger Intern., Inc., 600 F.2d 355, 361 n.8 (2nd Cir. 1979). (Test for "materiality" is the same for unlawful trading on inside information.)

### D. Applicability of S.E.C. Rule 13e–3

It is undisputed that the proposed merger qualifies as a Rule 13e–3 transaction subject to the disclosure provisions contained therein, and that defendants purported to comply therewith in their proxy statement. Plaintiffs allege, however, that the defendant, U.S. Steel's tender Offer and solicitations in support thereof were also subject to Rule 13e–3 and that the failure to disclose the First Boston and internal asset valuations at that time violated Rule 13e–3 of

the Exchange Act, 17 C.F.R. § 240.13e–3 (1981).

Rule 13e–3 prohibits "fraudulent, deceptive or manipulative acts or practices" in connection with "going private" transactions by the issuer or an affiliate of the issuer, and prescribes filing, disclosure and dissemination requirements in connection with such transactions. The plaintiffs contend that U. S. Steel was an "affiliate" of Marathon at the time of the tender offer and was therefore required to comply with Rule 13e–3 disclosure provisions at that time. Defendants deny that U. S. Steel had the control over Marathon at the time of the tender offer to qualify as an affiliate and therefore dispute that Rule 13e–3 applied to that step of the transaction.

Rule 13e–3 defines transactions within its coverage as

> any transaction or series of transactions
> · involving one or more of the transactions described in paragraph (a)(4)(i) of this section. [*inter alia, a tender offer for an equity security by the issuer or an affiliate* or a proxy solicitation by an issuer or affiliate in connection with a merger between the two] which has either a reasonable likelihood or a purpose of producing, either directly or indirectly any of the effects described in paragraph (a)(4)(ii) [causing any class of equity security subject to Section 12(g) or Section 15(d) to be held of record by less than 300 persons or to be delisted.] (emphasis added) 17 C.F.R. § 240.13e–3(a)(4).

The Rule defines an "affiliate" of an issuer as "a person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, such issuer" and expressly states that:

A person who is not an affiliate of an issuer at the commencement of such person's tender offer for a class of equity securities of such issuer will not be deemed an affiliate of such issuer prior to the stated termination of such tender offer or any extension thereof. 17 C.F.R. § 240.13e–3(a)(1).

Plaintiffs contend that the merger agreement entered into between U.S. Steel and the Marathon Board of Directors on November 18, 1981, one day prior to the commencement of the tender offer, gave U. S. Steel a "controlling influence" over Marathon. They rely primarily on the negative covenants in the merger agreement regarding Marathon's conduct of business pending the proposed merger. (See Pltfs.' Ex. 1(D), p. A7–A8). Those covenants essentially require Marathon to refrain from extraordinary corporate activity pending the merger.[7] The Marathon board also obligated itself to use its best efforts to preserve intact the business organization of Marathon, including the services of key employees and the good will of existing business relationships.

Rule 13e–3's enactment reflected SEC concern over the potential for overreaching of unaffiliated shareholders in a going private transaction undertaken by an issuer or between an issuer and one or more of its affiliates;

> Because a going private transaction is undertaken either solely by the issuer or by the issuer and one or more of its affiliates *standing on both sides of the transaction*, the terms of the transaction, including the consideration received and other effects upon unaffiliated security

---

**7.** Marathon covenanted that it would not sell or pledge or agree to sell any stock owned by it in any of its subsidiaries; that it would not amend its Articles of Incorporation or Code of Regulations; that it would not split, combine or reclassify its outstanding stock or pay any dividend with respect to such stock except regular quarterly cash dividends of not more than $.50 per share; that it would not issue or agree to issue any additional shares of its capital stock other than pursuant to presently outstanding employee stock options; that it would not ac-

quire or dispose of any substantial assets other than in the ordinary course of business; that it would not incur any material amount of indebtedness or enter into any other material transaction other than in the ordinary course of business; that it would not grant any severance or termination pay other than pursuant to policies then in effect, or enter into any employment agreement with any executive officer or director of Marathon; and that it would not increase materially compensation or benefits payable to employees.

holders, may be designed to accommodate the interests of the affiliated parties *rather than determined as a result of arms-length negotiations.* (emphasis added) S.E.C. release 34–17719 (1981) Fed.Sec.L.Rep. 23,709 at 17,245–29.

■ It is clear that the existence of the merger agreement *per se* did not make U. S. Steel an affiliate of Marathon prior to the commencement of the tender offer. *See,* 17 C.F.R. § 240.13e–3(g)(1)(ii)(A) (exempting two-step transactions characterized by equal consideration if a binding merger agreement or plan of merger is disclosed in the offer to purchase). Based on the evidence before the Court at this time, plaintiffs have not shown to a substantial likelihood that the merger agreement entered into between U.S. Steel and the Marathon Board was a product of anything less than arms-length negotiations. The Court also finds that the essentially negative covenants contained therein and the fact that the agreement was entered into a day before the tender offer belie the existence of the type of "control" over Marathon contemplated by Rule 13e–3's definition of an affiliate.[8] Accordingly, the Court finds that the defendants were not subject to the disclosure provisions of Rule 13e–3 at the time of the tender offer.

### E. The Two-Tier Price Structure of U.S. Steel's Tender Offer and Merger Under Section 14(e)

Plaintiffs in their Amended Complaint and their Memorandum in support of the Motion for a Preliminary Injunction assert that the two-tier price structure of the tender offer and proposed merger by U.S. Steel is a manipulative device in connection with the purchase of securities prohibited under § 10(b) and Rule 10–b–5 and in connection with a tender offer prohibited under § 14(e) of the Williams Act.[9] They allege that the pricing structure created "artificial market influences" by coercing Marathon shareholders into tendering their shares to U.S. Steel in order to avoid the risk of a later freeze out in the merger at the substantially lower price represented by the U.S. Steel notes. They argue that shareholder decisions in response to a tender offer should be based on the merits of the offer and not due to the coerciveness of the pricing structure. Such price structure allegedly "exploited shareholder fears of being stuck with . . . the 'back end' of the deal" and "imposed an artificial panic pressure on them to tender." (Pltf.'s memorandum p. 42–43).

The Supreme Court has stated that manipulative conduct under the anti-fraud provisions of the Exchange Act "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976). In *Sante Fe Industries, Inc. v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 the Court further stated

> Manipulation is 'virtually a term of art when used in connection with the securities market.' (citation omitted). The term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.

The defendant's use of a two-tier pricing structure was concededly designed by U. S. Steel to attract Marathon shareholders to their proposal and encourage them to tender their shares at the first stage of the transaction. (See Roderick testimony TR. III p. 82–83). In this respect, it is clear

---

**8.** In this regard, Judge Joseph Kinneary (S.D. Ohio) recognized U.S. Steel's "legitimate interest in preserving Marathon, without substantial change, pending a shareholder vote on the merger and the possible attainment of full ownership of the equity interest in Marathon." *Mobil Corp. v. Marathon Oil Co.,* 1981 Fed Sec.L.Rep. (CCH) ¶ 98, 375 at n. 18, p. 92, 269.

**9.** For the text of these sections and the rule, see p. 6, *supra.* Courts have construed the reach of the anti-manipulation language of these provisions to be coextensive. *Mobil Corp. v. Marathon Oil Co., supra, Panter v. Marshall Field & Co.,* 646 F.2d 271, 282 (7th Cir.) *cert denied,* U.S.     , 102 S.Ct. 658, 70 L.Ed.2d 631 (1981).

that the defendants' conduct was intentional.[10]

In *Mobil Corp. v. Marathon Oil Co., supra,* the United States Court of Appeals for the Sixth Circuit struck down the "lock-up" options discussed previously as violative of § 14(e).[11] The Court rejected the argument that § 14(e) merely requires full disclosure and found them to be manipulative devices which "not only artificially affect, but for all practical purposes completely block, normal healthy market activity, and in fact, could be construed as expressly designed for that purpose." The Court concluded in *Mobil* that the options "had the effect of creating an artificial price ceiling in the tender offer market for Marathon common shares" and therefore constituted manipulative acts or practices under § 14(e).

At the outset, it should be recognized that any tender offer is likely to be coercive to some degree. A shareholder is faced with a limited time in which to decide whether to accept the offered price for his shares, usually at a premium over that at which the stock was previously trading, or decline the offer and face the attendant risks. The risk is that a substantial percentage or the majority of his fellow shareholders will find the price acceptable and tender. His retained shares may then suffer a diminution in value, or impairment as to marketability. The prospect of being "frozen out" through a subsequent merger or reverse stock split is also increased.[12] Despite this inherent "coerciveness", Congress has not outlawed tender offers but only sought to regulate them, primarily through mandatory disclosure provisions.

Plaintiffs have not cited any case where a two-step transaction with a disparity in the consideration offered at either stage has been found to violate either § 10(b) or 14(e). On the contrary, both the case law as well as pertinent SEC Rules and Regulations appear to contemplate such pricing arrangements. In *Mobil, supra,* the United States Court of Appeals for the Sixth Circuit recognized that shareholders "not tender[ing] their shares to U. S. Steel would . . . risk being relegated to the 'back end' of U. S. Steel's takeover proposal and only receive $90 per share," and yet extended the offer as part of the relief granted. In a similar vein, SEC Rule 13e–3 provides an exemption from its coverage for second step "clean up" transactions, such as mergers, within one year after a tender offer, provided that the consideration offered to unaffiliated shareholders during the second step is equal to the highest consideration offered any shareholder during the tender offer. Where this "equal consideration" rule is not met, the "going private" transaction is subject to Rule 13e–3. Rule 13e–3 thus, by negative implication, acknowledges that such transactions occur and purports to regulate the second step of such two-tier transactions. While the Court finds neither the decision in *Mobil,*[13] *supra* nor the implicit recognition in Rule 13e–3 determinative of the validity of such pricing arrangements under 14(e) or 10(b), they caution against any holding that such arrangements are *per se* manipulative under § 14(e) or § 10(b).

When the background of the U.S. Steel tender offer and proposed merger is examined, the use of a two-tier pricing structure does not appear to have "coerced" Marathon shareholders into tendering their shares in response to the offer, nor to have interfered with the market of other potential offerors for Marathon stock. The U. S.

---

**10.** The Court also notes that there was testimony that the Marathon Directors also lobbied to increase the amount of cash offered "up front", at the apparent expense of the consideration to be paid at the merger stage. (Roderick testimony, Tr. III p. 81).

**11.** See n. 3, *infra.*

**12.** Such an intention on the part of the tender offeror is, of course, required to be disclosed under 14–D, and was so in this case by U.S. Steel.

**13.** In *Mobil,* the Sixth Circuit was not confronted with any challenge to the two-tier pricing structure under 14(e) or otherwise. Indeed, Mobil subsequently made a counter offer in response to U.S. Steel's offer, characterized by a similar disparity between the value offered in the tender offer and that provided for in the proposed freeze out merger.

Steel notes proposed as the "back end" consideration were, at the time of the tender offer, comparable in value to both "ends" of Mobil's original tender offer and proposed merger and offered Marathon shareholders a substantial premium over the prices which Marathon shares had been trading.[14] Mobil's offer, characterized by an essentially noncoercive pricing structure of $85 per share was successful in attracting 47% of the outstanding Marathon shares. This fact convinces the Court that the overwhelming response to U.S. Steel's tender offer was due, not to the coerciveness alleged to be inherent in a two-tier pricing structure, but because of the relatively attractive price offered at both ends of the transaction, giving those that tendered the opportunity to receive at a minimum approximately $106 per share.[15] In this regard, the United States Court of Appeals for the Sixth Circuit considered it "apparent from the record that a substantial majority of shareholders have agreed with the trial judge that the tender offer was reasonable and that they desired to accept it." Nor can the two-tier pricing structure be said to have been "manipulative" of market forces insofar as alternative tender offers for Marathon shares were concerned. Mobil's response to the U.S. Steel offer was to raise the overall price per share it would pay and structure its offer similarly. Shareholders who tendered would receive $126 cash for those shares accepted and the remaining shares would be exchanged for notes worth $90 in the proposed merger.[16]

In view of the essentially undisputed facts relevant to this issue, the Court finds that plaintiffs have not shown to a substantial likelihood that U.S. Steel's employment of a two-tier pricing structure in its tender offer for Marathon shares and proposed merger was coercive or "manipulative" in violation of 10(b) or 14(e). Plaintiffs are therefore not entitled to injunctive relief based on these claims.

### F. *Applicability of the Proxy Rules*

Plaintiffs also claim that Defendants violated 15 U.S.C. § 78n(a) by failing to issue a "timely and proper proxy statement with respect to the freeze-out merger." (Plaintiff's Memorandum p. 50). Specifically, Plaintiff's contend that if the tender offer and merger are to be considered as a "unitary transaction," then the time when Marathon Shareholders were realistically faced with the decision of whether or not to accept the merger was at the time of the tender offer. Accordingly, they argue that all communications at the time of the tender offer and during its pendency should be considered as proxy solicitations for shareholder consent on the merger. Plaintiffs argue that these proxy solicitations did not comply with 15 U.S.C. § 78n(a) and the rules promulgated thereunder in that Defendants did not disclose the asset valuations, liabilities, business operations, financial conditions and prospects of Marathon and Steel in the communications at and during the time of the tender offer.

Defendants contend that its two step transaction does not automatically call for application of the proxy rules at the tender offer step and that the communications made at and during the time of the tender offer cannot be considered proxy solicitations for approval of the merger step because those communications were made in an effort to comply with the disclosure requirements of the Williams Act and the SEC Rules covering tender offers.

**14.** The Mobil tender offer was an offer to purchase up to 40,000,000 shares of Marathon for $85 cash. The proposed freeze out merger would give shareholders Mobil Notes with an estimated value of $85 per share. At the time of the U.S. Steel offer, the 12-year 12½% $100 face value notes had an estimated value of $86 per share.

**15.** If 100% of Marathon shareholders had accepted the U.S. Steel offer and tendered all of their shares, each shareholder would ultimately realize approximately $106 per share. ($125 for 51% of their shares and $86 for 49% of their shares). A less than unanimous acceptance of the tender offer would increase the overall consideration received by those who tendered, assuming the minimum 30,000,000 shares were tendered.

**16.** Mobil subsequently withdrew this offer after its efforts in defending the antitrust litigation were unsuccessful.

■ The short answer to Plaintiffs' contention must be that under the case law and SEC Rules a two step transaction involving a tender offer and subsequent merger does not necessarily require compliance with the proxy rules of 15 U.S.C. § 78n(a) at the tender offer step. *Sheinberg v. Fluor Corp.*, 514 F.Supp. 133, 137–138 (S.D.N.Y. 1981); SEC Securities Act Release No. 33–5927, 3 Fed.Sec.L.Rep. (CCH) ¶ 24,284H (April 24, 1978). These authorities recognize that a tender offer and subsequent merger are distinct acts with separate concerns toward which the securities laws and SEC Rules are directed in their regulatory schemes. *Id.*

The statements made in the tender offer and the November 19th letter to Marathon Shareholders from Director Hoopman which refer to the tender offer and the merger (Plaintiffs' Exhibit IK and IL) were not proxy solicitations. On the contrary, the record indicates that these statements were made in compliance with the applicable laws and SEC Rules relating to tender offers. 17 C.F.R. § 240.14d–1, *et seq.* Item 5 of Rule 14d–1 required U.S. Steel to disclose the terms of the proposed merger with Marathon. Rule 14e–2, 17 C.F.R. § 240.-14e–261, required disclosure of the statements in Director Hoopman's letter. Rule 14d–9, 17 C.F.R. § 240.14d–9 required Marathon to file a Schedule 14D–9 with the SEC in which Marathon was obligated to disclose among other things, the existence of a merger agreement between it and U.S. Steel and its recommendation on the tender offer. To comply with these rules, U.S. Steel and Marathon referred to the merger agreement which would be proposed if the tender offer was successful. These references were not the equivalent of solicitations for the merger which would call forth application of the full panoply of the proxy

rules. The proxy rules were applicable only when the merger step of the transaction began. *See Sheinberg v. Fluor Corp.*, 514 F.Supp. 133, 138 (S.D.N.Y.1981)[17].

Plaintiffs have failed to show a likelihood of success on these claims.

### III. Allegations Relating To The Proxy Statement

Plaintiffs in their Memorandum in Support of the Motion for a Preliminary Injunction allege that the proxy statement of February 8, 1972 issued by Marathon and U. S. Steel was materially misleading in its reference to First Boston Corporation as an "independent" financial advisor. They also contend that the proxy statement did not adequately comply with Rule 13e–3 disclosure requirements with respect to the fairness opinions rendered therein by U. S. Steel and the Marathon Board of Directors.[18] In a supplemental memorandum in support of the Motion for Preliminary Injunction, The Dreyfus Fund, Inc. also asserts that the proxy statement violated 13e–3 in that it failed to disclose an appraisal of Marathon assets undertaken by Goldman Sachs, U. S. Steel's investment bankers, and an asset appraisal of Marathon in U. S. Steel's possession performed by Lehman Bros. for an unaffiliated third party.

### A. *Characterization of First Boston as "Independent"*

Rule 14a–9 prohibits solicitations made by means of any proxy statement which contain

"any statement which, at the time and in the light of the circumstances under which it was made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading..." 17 C.F.R. § 240.14a–9.

---

**17.** We note that had Steel disclosed the proxy material desired by Plaintiff, it may have violated Section 5 of the 1933 Act (jumping the gun prohibition). *See Sheinberg v. Fluor Corp.*, 514 F.Supp. 133, 138–139 (S.D.N.Y.1981).

**18.** Although Rule 13e–3 provides for filing of a schedule 13E–3 containing the disclosures required thereunder, the Rule recognizes that

Rule 13–e transactions may take a variety of forms, and may be subject to disclosure requirements pursuant to other applicable provisions of the Federal Securities laws. Accordingly, the Rule provides that the disclosure required by the Rule and schedule may be made in a proxy statement, as was done by defendants in this case. 17 C.F.R. § 240.13e–3(e)(1).

Plaintiffs allege that the characterization of First Boston as an "independent" financial advisor in the proxy statement was misleading because of its role in negotiating the transaction with U. S. Steel and the "contingent" nature of its fee.[19] The proxy statement, however, is replete with references to First Boston's ongoing advisory role in connection with an evaluation of the Mobil offer, the investigation of alternative transactions and ultimately its recommendation of the U.S. Steel tender offer and proposed merger. (See Pltfs.' Ex. I(H) p. 8, 9, 11). In fact, it expressly states:

"Marathon retained First Boston to act as financial advisor in connection with the Mobil offer, and with respect to matters arising in connection therewith, including the possible combination of Marathon with other corporations." (Pltfs.' Ex. p. 12).

█ The use of the designation "independent" cannot be said to have mislead Marathon shareholders as to First Boston's role in connection with the U. S. Steel transaction in light of the extensive disclosure in the proxy statement as to First Boston's ongoing involvement.

The question of whether First Boston's fee arrangement renders the characterization of First Boston as independent, misleading, presents a more difficult question. The proxy statement stated that "[f]or its services, First Boston is entitled to receive a fee of approximately $17 million plus expenses, as a result of the acquisition." The shareholders were also advised in the proxy statement that the fee contract had been disclosed in a schedule 14D–9 filed with the S.E.C. on November 2, 1981 by Marathon in connection with the Mobil tender offer, Marathon shareholders apparently received a copy of the 14D–9 schedule at that time. It should also be noted that contrary to plaintiffs' allegation that First Boston had a major financial interest in having the

merger approved, the fee arrangement discloses that First Boston's fee lost its contingent nature upon the success of U.S. Steel's tender offer:

"(c) . . . if more than 50% of Marathon's outstanding common shares is acquired in a transaction referred to in this subparagraph [*inter alia*, a tender offer] and the acquiring party proposes to acquire additional shares in a subsequent transaction, all shares so proposed to be acquired *shall be deemed to have been acquired* for the purpose of determining First Boston's fee . . ." (emphasis added). Pltfs.' Ex. I(H)).

The proxy statement thus adequately disclosed First Boston's dual role as an investigator and securer of alternatives to the Mobil offer and as a financial advisor. Similarly, the fee it had become entitled to as a result of its "negotiation" on behalf of Marathon in securing a successful alternative to the Mobil offer was fully disclosed in the proxy statement and shareholders were referred to a source where the fee contract had been disclosed. The proxy statement also revealed that Marathon and First Boston had had a business relationship for more than 10 years and that First Boston had rendered various financial services during that period.

Without finding that First Boston was, in fact "independent", the Court concludes that in light of the other information available to shareholders, its characterization as such was not materially misleading. In short, "shareholders were provided sufficient information to draw the pejorative inference plaintiffs suggest, if they chose to do so." (Defendant Marathon's Memorandum Contra Motion for Preliminary Injunction, p. 51).

**B.  *Disclosure Required Under Rule 13e–3***

The remaining challenges to the proxy statement are based on the adequacy of the

---

**19.** First Boston was retained by Marathon on October 31, 1981 to assist Marathon in developing alternatives to the Mobil tender offer. The formulas by which First Boston's fee would be determined reflect various possible scenarios. (See Pltf.'s Ex. 1(H)). The formula ultimately utilized gave First Boston a base fee of $1 million and $4 million plus 1% of the aggregate value of the consideration to be received by Marathon shareholders under the United States Steel tender offer and merger in excess of $85.00 per share (approximately $12 million).

disclosure required of Marathon and U.S. Steel in connection with the proposed merger under Rule 13e–3. Under the Rule, the proxy statement was required to include a statement "whether the issuer or affiliate . . . reasonably believes that the Rule 13e–3 transaction is fair or unfair to unaffiliated security holders." 17 C.F.R. § 240.13e–100, Item 8. In addition to a conclusory statement, the issuer and affiliate are required to

"Discuss in reasonable detail the material factors upon which the belief stated . . . is based and, to the extent practicable, the weight assigned to each such factor. Such discussion should include an analysis of the extent, if any, to which such belief is based on the factors set forth [below] and Item 9.[20]

The "fairness opinions" rendered by U. S. Steel and Marathon in the proxy statement were as follows:

"U. S. Steel continues to consider the Acquisition as a unitary transaction, the terms of which, including the terms of the Merger, were negotiated at arms length and approved by an independent Marathon Board of Directors. U.S. Steel believes the proposed terms of the Merger are fair to the unaffiliated shareholders of Marathon. In arriving at this conclusion, U. S. Steel considered, among other factors, the current and historic trading values of the shares, the current trading values of common stock of other integrated oil companies, the terms of the notes and the current dividend paid on the shares as compared to the current yield and the yield to maturity proposed for the notes.

\* \* \* \* \* \*

In approving the U. S. Steel offer, the Board of Directors viewed the proposed tender offer and subsequent Merger as a unitary transaction which afforded all of the Marathon shareholders the opportunity of receiving a substantial premium over the price then being offered by Mobil, as well as the opportunity of receiving the cash portion first.

Marathon believes that the Merger is fair to its unaffiliated shareholders. The basis for this belief is that the Merger is one part of a unitary transaction which was designed to offer to the shareholders of Marathon the opportunity to receive a substantial premium over the price then being offered by Mobil and the opportunity to receive the cash portion first, and to avoid the risk that the Marathon shareholders would not have available any lawful offer. Moreover, Marathon has taken into account a number of factors relating to the Merger including the fact that due to the 51% ownership of Marathon now held by U.S. Steel, no other party could be expected to pay a premium for the Marathon shares; the fact that under current conditions, the probable value of the notes when received in the Merger by the Marathon shareholders will exceed the current and historic market prices of Marathon shares and the net book value of those shares; the fact that shareholders will receive interest of $12.50 per year for each $100 note as opposed to the current dividend payment of $2.00 per share; and the concern that if the Merger is not approved, the market price of Marathon stock may return to traditional (lower) levels and that the shareholders may not be able to realize the proposed value of the Merger through any alternative transaction.

■ The thrust of Plaintiffs' arguments regarding these "fairness opinions" is that they were not limited to the fairness of the merger irrespective of the terms of the tender offer. The rule, however, merely requires that an opinion be given and the material factors on which it is based be disclosed. Given this information, shareholders will presumably decide for themselves what weight to accord the opinions. The rule does not limit the factors upon which an opinion may be fairly based.

---

20. Those factors include: current and historical market price of the stock; the book, liquidation and going concern values of the corporation; and the price paid in previous repurchases.

Item 9 requires the issuer or affiliate to state whether it has received any report, opinion or appraisal from an outside party which is materially related to the Rule 13e–3 transaction.

Both the U. S. Steel and Marathon opinions in the proxy statement disclosed that they considered the tender offer and proposed merger as a "unitary transaction." This is fully consistent with the testimony presented during the hearing. As to those shareholders who had the *opportunity* to tender their shares pursuant to the U. S. Steel offer, whether or not they did in fact tender, this opinion cannot be said to have been misleading or inadequate. The same "opinion" was offered by the Marathon Board of Directors at the time of the tender offer. (See Pltfs.' Ex. I(L)). The Plaintiffs' contention that the fairness opinion required under 13e–3 must be based solely on the merger, without regard to the previous tender offer, finds no support in the Rule. Rule 13e–3 requires the fairness opinions rendered to disclose the material factors upon which the belief is based, and even lists as a potential factor "the purchase price paid in previous purchases disclosed in Item 1(f)." Item (f) refers to purchases of securities by the issuer or affiliate within the two-year period preceding the date of the disclosure. Although the defendants were not required to disclose such purchases in this case[21], the defendants in effect merely disclosed that the price previously offered to Marathon shareholders in the U. S. Steel tender offer was a material factor underlying their opinion that the merger terms were fair to those shareholders.

The Marathon opinion also addressed the fairness of the merger to unaffiliated shareholders such as Dreyfus, who did not have the opportunity to tender their shares pursuant to the U.S. Steel offer. Specifically, the opinion states that in light of the 51% ownership position now held by U. S. Steel, the remaining shares no longer have the potential "premium" often attached to a controlling block of shares.

Contrary to the plaintiffs' assertion, the Court finds that the additional factors cited by Marathon with respect to the merger terms, specifically the adequacy of the consideration offered in the form of the U. S. Steel notes, is not inconsistent with the Board's prior characterization of the Mobil offer. When the potential premium attached to a controlling block of stock is no longer present, it is at least arguable that the value of the remaining shares will be negatively affected. A fairness opinion based in part on such an assumption is not misleading.

U. S. Steel's opinion that the merger terms were fair based on the historic trading values of Marathon shares and comparable securities, as well as the terms of the notes also adequately complies with Rule 13e–3. U.S. Steel's position is somewhat different than that of the Marathon Board of Directors with respect to the underlying basis of its fairness opinion. Its opinion that the value of the notes represents a "fair" exchange for the outstanding Marathon shares is perfectly consistent with the price it was willing to pay at the tender offer stage. It is entirely logical that U. S. Steel might have considered $86 per share to have been a fair price to offer Marathon shareholders at that stage as well, despite its inability to convince the Marathon Board to that effect.

Whether the unaffiliated shareholders were in fact offered a fair price in the proposed merger is not before the Court at this time, and the Court intimates no opinion in that regard. The only issue resolved herein is that the fairness opinions rendered by U. S. Steel and Marathon in the proxy statement adequately complied with Rule 13e–3's disclosure requirements and were not materially misleading.

Finally, plaintiffs contend that U. S. Steel's failure to disclose the Sachs and Lehman appraisals violated Rule 13e–3. 17 C.F.R. § 240.13e–100, Item 9. Item 9 of the Schedule requires disclosure of outside appraisals which are "materially related" to the Rule 13e–3 transaction. The Sachs re-

---

**21.** Disclosure under 1(f) is not *required* with respect to purchases of securities by a person prior to the time it became an affiliate. This Court has already concluded that U.S. Steel was not an "affiliate" of Marathon at the time of the tender offer. See discussion at p. 11–14, *supra.* 17 C.F.R. § 240.13e instruction to Item 1(f).

port concluded that Marathon's assets had a value of $150.27 per share (Pltfs.' Ex. 9). The Lehman Bros. appraisal found an asset value range of between $145.64 and $207.83 per share. (Pltfs.' Ex. 8). These values are substantially less than those arrived at in the internal asset valuation and the First Boston Report. They are at most cumulative insofar as informing Marathon shareholders that the estimated per share value of Marathon's asset exceeds the value of the U. S. Steel notes. There was also no testimony or evidence which indicated that these appraisals were materially related to the merger from either Marathon on U. S. Steel's perspective. Accordingly, the Court finds that the omission of these appraisals from the proxy statement does not warrant any injunctive relief.

### Conclusion

There is an inherent problem in ruling upon a Motion for Preliminary Injunction particularly in a complex case such as this. The decision of the Court might be misread as saying too little or too much. Only the question of equitable relief was raised and only the question of equitable relief has been decided.

Whether or not the shareholders, both tendering and non-tendering, received a fair price for their shares are questions unresolved and reserved for the hearing of this matter on its merits.

### CONCLUSIONS OF LAW

A. This Court has jurisdiction in accordance with 15 U.S.C. §§ 77v, 78aa and 28 U.S.C. § 1331 (1981).

B. The plaintiffs have not shown a substantial likelihood or probability of success on the merits of the following claims:

(1) That defendants violated 15 U.S.C. §§ 78j(b), 78n(e) (1981) and 17 C.F.R. § 240.10b–5 (1981) by failing to disclose material facts, by making misleading statements, and by trading on inside information.

(2) That defendants failed to comply in a timely manner with Rule 13e–3 of the Exchange Act, 17 C.F.R. § 240.13e–3.

(3) That the two-tier pricing structure of the tender offer and merger was a manipulative device in violation of §§ 78j(b) and 78n(e) and 17 C.F.R. § 240.10b–5.

(4) That the Proxy Rules promulgated under 15 U.S.C. § 78n(a) applied at the time of the tender offer.

(5) That defendants' proxy statement in connection with the proposed merger violated 15 U.S.C. § 78n(a), and Rule 13e–3, 17 C.F.R. § 240.13e–3.

▮ C. Where a plaintiff has failed to show a substantial likelihood or probability of success on the merits, a preliminary injunction should not issue. *Mason County Medical Assn. v. Knebel*, 563 F.2d 256 (6th Cir. 1977).

▮ D. A denial of equitable relief on a Motion for Preliminary Injunction does not thereby decide entitlement to damages.

E. In accordance with the foregoing Conclusions of Law, plaintiffs' Motion for Preliminary Injunction is hereby DENIED.

IT IS SO ORDERED.