DAN RIVER, INC., Appellee,

v.

Carl C. ICAHN, Icahn Holding Corporation, Icahn Capital Corporation, Icahn & Co., Inc., Wolf Investors Plan, Inc., Brett Investors Corporation, C.C.I. & Associates, Crane Associates, and Michelle Investors Corporation, Appellants.

No. 82–2014.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 18, 1982.

Decided Jan. 7, 1983.

---

Theodore Altman, New York City (Gordon, Hurwitz, Butowsky, Baker, Weitzen & Shalov, Kent T. Stauffer, Franklin B. Velie, Mathew E. Hoffman, Clarence Otis, Jr., Robert J. Schechter, New York City, of counsel), and Edward G. Turan, New York City, Charles F. Witthoefft, Hirschler, Fleischer, Weinberg, Cox & Allen, Linda L. Royster, Richmond, Va., for appellants.

Max Gitter, New York City (Moses Silverman, Andrew J. Peck, Allan J. Arffa, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Lewis T. Booker, Virginia W. Powell, Hunton & Williams, Richmond, Va.), for appellees.

Before WINTER, Chief Judge, MURNAGHAN, Circuit Judge, and BUTZNER, Senior Circuit Judge.

MURNAGHAN, Circuit Judge:

On November 12, 1982, the district court granted a preliminary injunction which prohibited the appellants, Carl C. Icahn and several companies under his control,[1] from exercising the voting rights appurtenant to any shares owned or acquired in Dan River, Inc., the appellee here. The temporary injunction was to endure until a full scale trial on the merits, scheduled for February 1983, could take place. Because the parties were in the midst of a heated battle for corporate control, we agreed to hear Icahn's appeal on an expedited basis. Our order reversing the district court's injunction was issued on November 19, 1982, with the assurance that written opinions would follow in due course.

## I.

Dan River, Inc. is a major textile manufacturer whose stock is publicly traded on the New York Stock Exchange. During the spring and summer months of 1982, Icahn began to purchase shares of Dan River's common stock on the open market. Once Icahn amassed more than five percent of Dan River's outstanding stock—that occurred on September 13, 1982—the group became subject to the disclosure requirements of section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(d)(1).

As required by the 1934 Act, Icahn promptly filed a schedule 13D disclosure statement which, among other things, set forth the group's intentions with regard to Dan River. Icahn, to say the least, is no passive investor. As the 13D statement indicated,[2] Icahn intended to obtain control

---

1. The companies are: Icahn Holding Corporation, Icahn Capital Corporation, Icahn & Co., Inc., Wolf Investors Plan, Inc., Brett Investors Corporation, C.C.I. & Associates, Crane Associates, and Michelle Investors Corporation. For simplicity's sake, we will refer to the entire takeover group as "Icahn."

2. As Icahn reported in the Schedule 13D:

Registrants [Icahn] presently intend to pursue one of two alternative courses of action with respect to the Issuer [Dan River] and the Issuer's shares. Registrants will either (1) seek control of the Issuer, or (2) seek to

of Dan River and commit the company to an active course of transactions potentially including a merger with one of the corporations controlled by Icahn or a sale of Dan River's assets so as to generate cash for additional business combinations. The Icahn group was not singleminded, though. The group conceded in the 13D statement that, given an acceptable offer, it would be willing to abandon the takeover plans and sell its Dan River shares.

Dan River has emphasized that Icahn has taken such a position in other companies before. According to management, Icahn's position is nothing short of an extortionate scheme: Icahn purchases a significant interest in a company and then, by threatening a battle for control, puts pressure on management to either buy out its interest or to find a third party, the so-called "white knight," to do so—all at a considerable profit to Icahn. It appears that Icahn rarely needs actually to engage in a battle for corporate control by way of a tender offer; its mere presence and its ability to engage in a control struggle, according to Dan River, have convinced the management of oth-

er companies to rid themselves of Icahn through a buy-out at inflated prices.

Not so here, however. Dan River management met with Icahn, rejected its overtures, and took two immediate steps to fend off the Icahn group. On October 4, 1982, Dan River issued 1.7 million shares of preferred stock to a newly created employee stock bonus plan. The shares enjoy voting rights and, as is customary for issues of preferred stock, stand ahead of the common shares with regard to dividend payments and distribution rights in the event of dissolution. The bonus plan awards the preferred stock on the basis of an employee's salary, and therefore may be expected to help management—the highest paid employees—consolidate control of the company while diluting Icahn's position in Dan River.

On the following day, Dan River management brought suit in the United States District Court for the Western District of Virginia. Dan River raised five arguments in the complaint, and sought equitable relief in the nature of an injunction prohibiting Icahn from dealing with Dan River in any way. The first ground alleges that

sell their shares in the open market or in privately negotiated transactions to one or more persons, which may include the Issuer.

In determining whether to seek control ..., Registrants intend to request a meeting with the Issuer to obtain management's views concerning Registrants' proposals that (1) the Issuer consent or agree to Registrants' acquisition of additional shares of the Issuer with a view toward obtaining control of the Issuer through purchases in the open market, in privately negotiated transactions and/or from the Issuer itself; and (2) the Issuer consider the possibility of selling some or all of its assets to a purchaser which may include or consist of the Issuer's present management and retaining all or most of the proceeds of such sale or sales for various uses including possible future acquisitions of various publicly or privately held companies and/or the Issuer consider a business combination of the Issuer with Icahn Holding or a subsidiary of Icahn Holding. Registrants' proposals would include having their designees elected to the Issuer's Board of Directors in place of, or in addition to, some, or all of the Issuer's present directors.

If the Issuer reacts favorably to these proposals, Registrants intend to follow the alternative of purchasing shares for the purpose

of obtaining control and then to attempt to sell some or all of the Issuer's assets and/or to engage in a business combination with Icahn Holding or its subsidiaries, as described above.

If management ... indicates that it is adverse to Registrants' proposals, Registrants will nevertheless consider whether to seek control ... or to seek to sell their shares. If Registrants determine to follow the alternative of seeking control, Registrants would consider, depending on price and availability, purchasing additional shares ... from time to time in open market purchases or privately negotiated transactions. In addition, Registrants would consider engaging in a solicitation of proxies to elect their nominees as directors ... and/or making a tender offer for up to 51% of the Issuer's shares. If Registrants obtain control they will ... attempt to sell some or all of the Issuer's assets and/or engage in a business combination with Icahn Holding or its subsidiaries.

If Registrants determine to follow the alternative of seeking to sell their shares ..., Registrants may seek to sell ... in the open market or in privately negotiated transactions to one or more purchasers which may include the Issuer.

Icahn's "buy-me-out-or-face-a-takeover" ultimatum is a manipulative and deceptive scheme in violation of section 10(b) of the 1934 Act, 15 U.S.C. § 78j, and its Rule 10b–5, 17 CFR § 240.10b–5 (1982). The second ground alleges that Icahn's disclosures in the Schedule 13D were deficient. The third ground maintains that Icahn's interests in Dan River are being financed with money derived from a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68. The fourth claim is that Icahn's disclosures are insufficient under the Virginia Take-Over Bid Disclosure Act, Va.Code §§ 13.1–528 through 13.1–541. The fifth ground asserted is that Icahn intends to "loot" Dan River in violation of the corporation law of the Commonwealth of Virginia.

Having failed to receive an acceptable offer from management for its shares, Icahn responded to Dan River's unreceptive stance with a tender offer. On October 25, 1982, Icahn proposed to buy 3.1 million shares of common stock at a price of $18 per share subject to a key condition—that Dan River management not oppose the offer. In the event management should resist the offer, Icahn would only purchase 700,000 shares at the lower price of $15 per share. Icahn made the appropriate filings under section 14(d) of the 1934 Act, 15 U.S.C. § 78n(d).[3]

Management was undeterred in its opposition by the offer. It actively sought to frustrate the success of Icahn's bid and, moreover, amended its complaint filed in the United States District Court for the Western District of Virginia to add a twofold challenge to the legality of the offer. Dan River claims the offer is an illegal "bait-and-switch" offer proscribed by section 14(e) of the 1934 Act, 15 U.S.C. § 78n(e), and that the disclosures made by Icahn pursuant to section 14(d) of the Act, 15 U.S.C. § 78n(d), were misleading in their representations and in their omissions.

The $18 conditional offer on November 9, 1982 lapsed by its own terms. Icahn then revised its tender offer. Under that latest proposal, Icahn offers to buy 2 million shares at $16.50 per share. Under the terms of the offer, Icahn reserves the right to purchase more than 2 million shares if they are tendered.

Management was not without a counter. With the tender offer under way and nearing its completion, Dan River moved for a preliminary injunction to block Icahn's purchase of stock under the bid.

The district court, sensing that both parties had a great deal at stake, fashioned what it deemed to be a fair compromise. It permitted the tender offer to go forward, subject to an extension of the withdrawal date by one week and a requirement that certain inconsistencies in Icahn's disclosure statements be corrected. Neither party appeals that portion of the injunction. At issue are the provisions of the district court's order which prevent Icahn from exercising any of the rights which inhere in the shares already bought and the shares to be acquired in the tender offer. Icahn is enjoined from voting, from calling shareholder meetings, from seeking proxies and from attempting in any way to change the management or board of directors of Dan River until the merits of the action are resolved sometime in or after February of 1983. The district court also endeavored to minimize any harm which Icahn might suffer from the "sterilization" of its shares, wisely enjoining management from taking any actions outside the ordinary course of business in the interim.

Icahn appeals the "sterilization" of its shares.

## II.

Our jurisdiction is predicated upon 28 U.S.C. § 1292(a) and we accordingly limit our review to the propriety of the preliminary injunction issued by the district court.

---

3. The offer states that it is being made by Icahn Capital Corporation, C.C.I. & Associates, and Crane Associates.

The trial court standard for a preliminary injunction is the balance-of-hardship test. As succinctly stated in *North Carolina State Ports v. Dart Containerline Co.*, 592 F.2d 749 (4th Cir.1979):

> Four factors enter into the determination of whether to grant or to withhold interim injunctive relief: (a) plaintiff's likelihood of success in the underlying dispute between the parties; (b) whether plaintiff will suffer irreparable injury if interim relief is denied; (c) the injury to defendant if an injunction is issued; and (d) the public interest.

*Id.* at 750. We there provided further guidelines regarding the weight to be assigned each factor:

> There is a correlation between the likelihood of plaintiff's success and the probability of injury to him. If the likelihood of success is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify issuance of the injunction.

*Id.* *See also Fort Sumter Tours, Inc. v. Andrus*, 564 F.2d 1119 (4th Cir.1977); *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir.1977). The standards are fully applicable in cases involving tender offers and the strictures of the Williams Act. *See Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975).

With these considerations in mind, we proceed to a determination of how the balance-of-hardship tips.

### III.

The balance-of-hardship leads us to conclude that the primary critical factor for purposes of determining the propriety of injunctive relief here is the likelihood that Dan River will prevail on the merits of its complaint. That factor—the likelihood of success on the merits—is examined in depth in Part IV of our opinion. But first, it is necessary to review the hardships facing both parties which indicate that the balance does not tilt in Dan River's favor and that, accordingly, a strong likelihood of success on the merits is necessary to justify the granting of the preliminary injunction.

We begin with the prospects for Dan River and, for purposes of analysis, assume the company's allegations are true. The company fears that Icahn will, upon obtaining control of Dan River, embark upon a course of extraordinary transactions which will dismantle the company as it now exists. Those transactions, management argues, simply cannot be undone. What is more, management fears that Icahn will "loot" Dan River in the process, diverting its assets to its own use.

Management's fears, if substantiated, would be weighty. But they must be discounted for at least two reasons. First, the harms it fears are distant. As Icahn notes, Virginia corporation law, along with federal laws pertaining to proxies, makes it a virtual certainty that, however successful Icahn's tender offer may turn out to be, any major changes in Dan River will take time. Management will have more than adequate opportunity to petition a court for injunctive relief when and if the fears mature into imminent danger. And if, perchance, Icahn makes good on its stated intention to dismiss the case at hand upon seizing control of the company, a timely suit seeking interim relief still might be brought by a shareholder. Second, as to Dan River's allegation that Icahn will breach fiduciary duties and "loot" the company, we note that adequate remedies at law exist to compel a corporate looter to disgorge misappropriated funds. *See, e.g., Crump v. Bronson*, 168 Va. 527, 191 S.E. 663 (1937). The availability of those remedies operates as a restraint sufficient to permit discount of suspicions unsupported as yet by any hard evidence.

While Dan River's fears are, therefore, premature, the costs to Icahn on the other hand will come due very soon. As we perceive the situation, the "sterilization" of Icahn's shares inevitably works a serious harm. Assuming that Icahn will prevail at trial, the harm to Icahn is a considerable roadblock in its quest for control of Dan

River. Icahn loses valuable time. The mere existence of the temporary injunction can be expected to deter some shareholders from tendering. If the tender offer leaves Icahn short of a numerical majority but with enough shares to constitute an imposing presence, further steps—especially, a proxy battle—would be in the offing. The order prohibits Icahn from soliciting proxies. In the months to come before Icahn's shares are freed from the restrictions of the order, management can be expected to court the remaining shareholders as it gears for the final contest for control. Riding the crest of its tender offer, Icahn's chance of winning would appear strong. With time to regroup and consolidate, management's chances are enhanced. The potential harm to Icahn, then, is loss of its best opportunity to seize control of a major corporation. The delay to Icahn could be crucial. *See Edgar v. MITE Corp.,* —— U.S. ——, ——, 102 S.Ct. 2629, 2638, 73 L.Ed.2d 269 (1982) (delay can seriously impede a tender offer).

Weighing harms is no simple task. Critical to the weighing process here, though, is the simple fact that Dan River faces no immediate threat of irreparable harm. Under the circumstances, we cannot conclude that the balance-of-hardship favors management.

IV.

Furthermore, we do not believe that Dan River has shown a strong likelihood of success on any of its legal claims. While we of course do not, on a partial record in an expedited appeal, purport to provide definitive rulings on the many legal questions raised, we find that Dan River faces innumerable hurdles which make the likelihood of its success at trial small.

A

■ The first claim we address is Dan River's contention that Icahn's "buy-me-out-or-face-a-takeover" ultimatum is a manipulative and deceptive scheme prohibited by section 10(b) of the 1934 Act, 15 U.S.C. § 78j, and Rule 10b–5, 17 CFR § 240.10b–5 (1982), promulgated thereunder.[4]

We note at the outset that the district court did not purport to base its order on any perceived questions under Rule 10b–5. Nevertheless, the issue is before us as a possible ground upon which the injunction may rest. Our analysis of Dan River's claim under Rule 10b–5 reveals that there are problems inherent in Dan River's position which suggest that the claim will not prevail.

One serious problem is the matter of standing. It is not at all clear to us that Dan River has even stated a claim under Rule 10b–5. In *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), the Supreme Court held

**4.** Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, provides in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

\* \* \* \* \* \*

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b–5, 17 CFR § 240.10b–5 (1982), provides:

Employment of manipulative and deceptive devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

that only buyers and sellers of securities within the relevant time period of the allegedly manipulative acts may sue under section 10(b) and Rule 10b–5. A hot dispute between Dan River and Icahn exists over whether the company was a purchaser or seller of its shares during the period in question. Dan River argues that the alleged fraud began the moment Icahn began purchasing Dan River stock in the spring of 1982, and that the company sold some of its common stock in June or July of 1982, thus giving Dan River standing to sue. Icahn denies that Dan River made any such sales.

Moreover, we observe that, prior to September of 1982 and Icahn's filing of a Schedule 13D statement with its allegedly coercive ultimatum to management, Icahn merely purchased on the open market, without representations of any kind. Thus, even if Dan River did sell its stock in the summer months, there is a serious question whether the sale occurred during the period when Icahn was supposed to be manipulating the market.

Dan River might argue, but has not argued thus far, that its issuance of preferred stock on October 4, 1982 gives it standing under section 10(b). The argument suffers from at least one serious flaw—that issuance of stock might well be set aside as unlawful. Icahn has filed a counterclaim to set aside the issuance as devoid of a bona fide business purpose and merely a scheme to dilute Icahn's position in Dan River and to make the proposed takeover more difficult to accomplish.[5]

Apart from standing, there is the difficult matter of proof. Dan River must prove that Icahn's ultimatum amounts to "intentional or willful conduct designed to deceive or defraud investors by artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976). The company likens Icahn's ultimatum to an

extortionate threat, but we fail to appreciate the supposed similarity. Icahn does put Dan River's management to a difficult choice—accede to a takeover or employ defensive moves—but so does any party who, altogether lawfully, contemplates a takeover attempt. On the record as it now stands, we can conclude only that Icahn is extraordinarily frank and reminds management of its defensive options by indicating that, if the price is right, the takeover might be aborted. We doubt that such frankness will be found to violate section 10(b) and Rule 10b–5 and pause only to highlight a potential irony. Were Icahn's conduct to be held unlawful, we would be left with the peculiar result that the tender offeror who openly informs the investment community that a buy-out is a distinct possibility is damned while the tender offeror who conceals the same information proceeds unimpugned.

## B

The second management claim to consider is the allegation that Icahn's collective filings are inadequate. The claim spans three statutory provisions—sections 13 and 14 of the 1934 Act, added by the Williams Act of 1968, Pub.L. No. 90–439, 82 Stat. 454 (codified as amended at 15 U.S.C. §§ 78m, 78n), and the Virginia Take-Over Bid Disclosure Act. For our purposes, it is sufficient to treat the various provisions as one.

Dan River alleged a welter of supposed disclosure inadequacies but, upon review, it is apparent that the case boils down to the omission of one identifiable and allegedly material fact. With the possible exception of that omission—which will be discussed in more detail momentarily—Icahn's filings appear exceptionally thorough. Icahn clearly and forthrightly set forth its intent to consider extraordinary corporate transac-

---

**5.** The preferred stock was issued to an employee stock bonus plan which awards the shares as a function of an employee's salary. The fact that the management group stands near the head of the line in terms of amounts received in the way of benefits in the preferred stock issue,

the absence of any immediate return to Dan River, and the preferential status of the preferred vis-a-vis the common stock being purchased by Icahn on the open market and by tender offer all give substantiality to the Icahn counterclaim.

tions such as a merger or a sale of substantially all of the corporate assets. *See* n. 2, *supra*. The disclosures here give full warning that sweeping changes might take place if Icahn should obtain control. Further, the materials clearly state that the proceeds of any sales of assets would, prior to any distribution to shareholders, likely be devoted to efforts to acquire other companies and securities.[6]

The omission so heavily stressed by Dan River is Icahn's failure to reveal that Icahn Capital, one of Icahn's controlled companies, faces a contingent obligation of $5,000,000. The obligation represents a guarantee of a bank loan to a company not involved in the present transaction. When pressed at oral argument, counsel for Dan River agreed that the liability is probably immaterial for purposes of Icahn's ability to meet the terms of its tender offer, but remained resolute in the belief that the liability is material to those shareholders who might prefer to spurn the tender offer and reap the expected benefits of future transactions involving both Dan River and the Icahn group.

While the issue is not free from doubt, we have concluded that it is far from clear that the omission will be adjudicated in a full scale trial on the merits to have been material—that is, that the fact would assume "actual significance in the deliberations of the reasonable shareholder." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). A liability of $5,000,000, discounted to some extent because it is contingent, of one of the concerns comprising the Icahn group, does not appear to alter the compos-

ite picture of the financial ability of the Icahn group to carry out the aggressive plans it proposes. A perusal of the financial statements reveals that the group boasts approximately $28 million in shareholder or partner equity (assets less liabilities)—a sizeable sum, indeed, to pursue its plans.

More significantly, however, the recognition that the case involves, in the end, the omission of one identifiable and allegedly material fact raises the question whether the "sterilization" order which we review here is an appropriate remedy for the supposed wrong. On the facts of the particular case before us, we are constrained to hold that the order "sterilizing" Icahn's stock cannot be justified on the basis of the insufficient disclosure alleged.

A conclusion that an offeror has failed to make full disclosure must, at bottom, rest upon a finding that the shareholders are being deprived of information necessary to evaluate and act upon the offer. The best remedy for such a problem is to get more information to the shareholders before they have to decide whether or not to tender their shares. Had management been serious in its desire to get all relevant information to its shareholders, it easily could have directed the district court's attention to the omitted contingent liability and sought an order holding up the tender offer unless and until Icahn amended its 14D statements, and appealed the refusal of the district court to do so.

Management has not followed such a course, however. Dan River has not appealed the district court's refusal to enjoin the tender offer.[7] Rather, it merely argues

---

**6.** We reject out of hand Dan River's contention that Icahn has misled shareholders as to its opinion of management's capabilities. Icahn disclosed, as it must, that it offered management ·future employment with the company. Dan River feels that disclosure is irreconcilably inconsistent with Icahn's expressed criticisms of management. But that is not necessarily, or even probably, so. Icahn has been critical of management's major, long-term policies, but has expressed no quarrel with management's capacity to operate Dan River in its day-to-day

affairs. The distinction is not too subtle for shareholders to grasp from the filings by Icahn.

**7.** The district judge's conclusion that alleged inaccuracies or insufficiencies of disclosure were not extreme in that sense, thus, stands unrebutted and uncontested. That being so, we should not disregard the consideration that "takeover bids should not be discouraged because they serve a useful purpose in providing a check on entrenched but inefficient management." S.Rep. No. 550, 90th Cong., 1st Sess. 3 (1967). As the Supreme Court observed upon surveying the legislative history of the Williams

on appeal that the more limited "sterilization" order is nevertheless an appropriate remedy for perceived disclosure violations. Reference is made to other cases which have employed the remedy without detailed analysis,[8] and a theory in support of the position is proffered—that where the greater is permissible, the lesser is *a fortiori* acceptable. To the extent such an approach has merit, it applies only to situations where the greater and the lesser are like in kind.

■ The so-called lesser remedy of "sterilization" is most certainly acceptable to management, for management is the chief beneficiary of the order. "Sterilization" of Icahn's shares immunizes management from any challenges to its control of the company. Yet the thrust of disclosure laws is to protect shareholders, not management. Management's right of action under the Williams Act is primarily in the interest of the Dan River stockholders to ensure "truthful and complete" information. *Dan River, Inc. v. Unitex Ltd.*, 624 F.2d 1216, 1224 (4th Cir.1980), *cert. denied*, 449 U.S. 1101, 101 S.Ct. 896, 66 L.Ed.2d 827 (1981). Manifestly, the "sterilization" order affords shareholders no more "truthful and complete" information than that already provided by Icahn in its filings.

Dan River has, on appeal, demanded no relief in the nature of greater disclosure. The district judge manifestly perceived no inadequacy in Icahn's representations sufficient to require the enjoining of the tender offer.

At most, the "sterilization" order is an attempt to foreclose any harm that share-holders might suffer as a consequence of Icahn's purchase of shares under the tender offer. In that regard, "sterilization" of Icahn's shares exacts a heavy toll from Icahn while, at best, yielding stockholders a small measure of premature relief. Icahn is enjoined from actions which can hardly be said to pose harm to shareholders. There is little to be feared, for instance, in permitting Icahn to solicit proxies. Nor does there appear to be much cognizable harm in allowing Icahn to press a vote for new management—a vote the result of which could, if the need arises, be voided or enjoined from taking effect upon the motion of the current management or upon the filing of a suit by interested shareholders.

We have no occasion to assess the appropriateness of a "sterilization" order in all the circumstances of faulty disclosure which might be envisioned. The "sterilization" order before us here, however, is an overbroad and inequitable interim remedy for the alleged disclosure violation.

### C

■ Dan River's third argument is that the tender offer itself violates the Williams Act. The claim is that the two-price offer —$18 per share for 3.1 million shares if management capitulates, $15 per share for 700,000 shares if management fights on—is tantamount to a "bait-and-switch" operation. According to Dan River, Icahn never believed that management would accede to the tender offer and, in reality, the higher offer for more shares was an illusory piece

Act, "Congress disclaimed any 'intention to provide a weapon for management to discourage takeover bids . . .' [and] represented a conviction that neither side in the contest should be extended additional advantages vis-a-vis the investor, who if furnished with adequate information would be in a position to make his own informed choice." *Edgar v. MITE Corp.*, —— U.S. ——, ——, 102 S.Ct. 2629, 2636, 73 L.Ed.2d 269 (1982) (citations omitted).

**8.** Among Dan River's cited precedents are *Chem-Nuclear Systems, Inc. v. Waste Management, Inc.*, No. 82–3417, slip op., (9th Cir. July 20, 1982), *National City Lines, Inc.*

*v. LLC Corp.*, 687 F.2d 1122 (8th Cir.1981), and *Bath Industries, Inc. v. Blot*, 427 F.2d 97 (7th Cir.1970). The first two cases offered no analysis of the considerations at stake in a "sterilization" order. And *Bath Industries* is far from the mark because, unlike the case here, the defendants had already obtained the stock needed to exercise control of the corporation. Sterilization of the shares therefore would only delay the inevitable. As we pointed out earlier, however, the sterilization of Icahn's shares may seriously and adversely affect Icahn's effort to obtain control, as an additional proxy battle may be required.

of bait which induced shareholders to tender.

The hurdles facing Dan River are nearly insuperable by our calculation. First and foremost, it is doubtful that Dan River's challenge to the substance of the offer even states a claim for relief under section 14(e) of the 1934 Act, 15 U.S.C. § 78n(e).[9] The legislative history of the Williams Act makes clear that the sole purpose of section 14(e) is to ensure adequate disclosure to shareholders so that they may make informed decisions whether or not to tender their shares. *See Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 26–37, 97 S.Ct. 926, 941–47, 51 L.Ed.2d 124 (1977); *Martin Marietta Corp. v. Bendix Corp.,* 549 F.Supp. 623 (D.Md.1982) (*Marietta II*). After a careful study of the authorities, the *Marietta II* court concluded that section 14(e) could not be employed solely to challenge the substantive goodness of a tender offer or its effects on the forces of supply and demand in the marketplace. Rather, some material nondisclosure must be proved in order to sustain the claim. *Id.* at 627–33.

We need not resolve the issue. It is sufficient merely to raise the question for its viability poses a considerable problem which Dan River will have to solve at trial if it is to prevail.[10]

Assuming section 14(e) does recognize claims against the substance of a tender offer, it is still far from clear that Dan River has a serious chance of prevailing. The mere fact that a tender offer affects the market price of a stock cannot mean that the tender offer is an unlawful scheme to manipulate. Were that so, all tender offers would be forbidden. The fact that Icahn's two-level offer injects an element of uncertainty into the offer does not, in and of itself, make the offer a manipulative device. Most tender offers include conditions which make acceptance of the tender uncertain. *See* 1 M. Lipton & E. Steinberger, *Takeovers & Freezeouts* § 1.7.11 (1978) (clauses permitting revocation of offer in event of litigation).

The closest analogy presented to us is found in *Cities Service Co. v. Mesa Petroleum Co.,* 541 F.Supp. 1220 (D.Del.1982), and it casts further doubt on Dan River's claim. The acquirer made a "friendly" tender offer

---

9. Section 14(e) provides:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

10. At trial, Dan River might place reliance on *Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366 (6th Cir.1981), which held that a section 14(e) claim was stated in the absence of any alleged deception or failure to disclose. At issue was an option agreement between Marathon, the target corporation, and U.S. Steel, a "white knight," for the purchase and sale of Marathon's "crown jewel"—the Yates Field, a rich oil resource. The option was exercisable only if a hostile offeror—for instance, Mobil—gained control of Marathon. The court rea-

soned that section 14(e) might be violated because the option effectively imposed a ceiling on the price third parties like Mobil would be willing to pay for Marathon. Implicit in the court's reasoning, too, was the prospect that the option agreement appeared to lack a business purpose.

The case has been criticized, *see, e.g., Marietta II, supra,* at 629–30; *Marshall Field & Co. v. Icahn,* 537 F.Supp. 413, 422 (S.D.N.Y.1982), as inconsistent with the teachings of *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 476–77, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977), and *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), where the Supreme Court strongly indicated that deception is a predicate to a section 14(e) claim. Moreover, the *Marathon* case involved a different breed of animal than the one we are asked to call dangerous here. Here, we are asked to condemn an offer *in the securities marketplace* as an artificial manipulation of that very market. In *Marathon,* a transaction *outside* the securities marketplace designed solely to impede the natural forces of supply and demand, and thereby to create an unnatural, hence "false," situation, within the market was implicated. The distinction, we think, is critical.

for 46 percent of the target's shares at $50 per share. Target management . rejected the "friendly" offer, and the acquirer followed with a second "hostile" offer for 15 percent of the target at the lower price of $45 per share, with the right to buy more than 15 percent if financing could be arranged. The target moved for a preliminary injunction, alleging that the first "friendly" offer was designed to induce shareholders into believing that the acquirer could well afford to purchase at least 46 percent at $50 per share and that, consequently, shareholders would embrace the second, lower offer in the hopes that more than the stated 15 percent would be purchased. The district court denied the motion, pointing out that full disclosure apparently was made and that the claim therefore was unlikely to prevail.[11]

We cannot overlook the fact, as well, that the initial two-level offer has lapsed. The shareholders who tendered their shares under the original offer denominated "bait-and-switch" by management have been granted, under a portion of the district court's order from which no appeal has been taken, and with which Icahn has signified its readiness to comply, additional time to reconsider their decisions—more time, even, than Icahn's proposal of the second offer gave them. In the typical true "bait-and-switch" operation, the consumer, in contrast to Dan River shareholders here, is rarely given time to deliberate in a leisurely manner.[12]

As to alleged disclosure problems with respect to the two-level offer, it would appear that Dan River has little chance of prevailing. Icahn stated the terms of the offer, the conditions necessary for the $18 offer to be effective, and the effects of over- and under-subscription to the offer. Moreover, the Schedule 14D filings by

Icahn made clear that management was resistive to the offer and, therefore, could be expected to refuse to accede to the tender offer, rendering the $18 offer evidently nugatory.

### D

▮ Dan River's fourth claim invokes the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, and its provision making unlawful the acquisition of an interest in a business through funds derived from a "pattern of racketeering activity." § 1962(a). A pattern of racketeering activity is defined as the commission of at least two predicate offenses within a ten year period. § 1961(5). The predicate offenses include extortion which qualifies as a felony under state law, federal mail fraud, and federal securities fraud. § 1961(1).

To understand Dan River's RICO claim, it is necessary to become acquainted with Bayswater Realty & Capital Corporation ("Bayswater"). In a previous incarnation, Bayswater was a company whose assets consisted primarily of real estate holdings. Icahn obtained control of Bayswater and, accepting Dan River's version of things, began selling off Bayswater's real estate properties, thus converting them into securities and other liquid instruments.

Dan River argues that Icahn's transformation of Bayswater constitutes the centerpiece of its RICO claim. The argument is that Bayswater has become an investment company under Icahn's stewardship, that the Investment Company Act of 1940, 15 U.S.C. § 80a–1, et seq., requires all investment companies to register with the SEC, and that Icahn willfully and deliberately failed to register Bayswater.

11. Analogies one-step removed also can be drawn from *Marietta II, supra,* at 629–33, and *Radol v. Thomas,* 534 F.Supp. 1302, 1311–13 (S.D.Ohio 1982). Those cases involved so-called "front-end loaded" offers which propose one price for the actual tender offer and a second price for a subsequent merger. Both cases expressed serious doubt that such offers will, after full adjudication, be held unlawful.

12. A "switch," as well as "bait," is needed to make the operation work. *See, e.g., Tashof v. FTC,* 437 F.2d 707, 709 (D.C.Cir.1970). The FTC recognizes as much and, in its *Guides Against Bait Advertising,* 16 CFR § 238 (1982), proscribes certain activities designed to pressure the consumer into making the "switch."

The predicate offenses alleged by Dan River involve Icahn's employment of Bayswater in three earlier takeover attempts. In two of the three cases, Icahn used funds from Bayswater as part of the pool of money to buy shares of the targets. In those cases, management of each targeted company eventually repurchased the shares. In the third case, Icahn merely listed Bayswater as among the money sources available in a possible takeover.

According to Dan River, Icahn's uses of Bayswater amount to securities fraud. The theory is that Icahn represented that it had authority to use Bayswater's funds, whereas an unregistered investment company could not vest Icahn with such authority.[13] Dan River also. asserts that Icahn's uses of Bayswater constitute mail fraud. . In each instance, Carl C. Icahn, as an officer of Bayswater, allegedly violated his fiduciary duty to shareholders and concealed material information in the process, thus violating the mail fraud statute, 18 U.S.C. § 1341.

Finally, Dan River asserts that predicate offenses may also be found in Icahn's use of the "buy-me-out-or-face-a-takeover" ultimatum on earlier occasions. As already observed, Dan River considers Icahn's strategy a violation of section 10(b) and Rule 10b–5, and has not hesitated to characterize it as "extortionate."

Our review of the RICO claim persuades us that there are just too many flaws and too much speculation to conclude that Dan River is likely to succeed at trial. Even before examining the question of whether Dan River has a substantial likelihood of proving what must be a difficult case at best, we must address an important preliminary issue. Dan River's complaint seeks solely equitable relief. There is substantial doubt whether RICO grants private parties such as Dan River a cause of action for equitable relief. Section 1964(c) grants private parties a right of action for treble damages against the RICO offender, but the section has nothing to say about injunctive relief. Subsection (b) of section 1964 permits the attorney general to bring proceedings under the Act, and that provision—in sharp contradistinction to § 1964(c)—allows for equitable relief.

■ To sustain the district court's order on RICO grounds, then, Dan River must establish that actions for equitable relief are implied in the statute. While we do not undertake to resolve the question, nevertheless, the probability of success is affected adversely by the very existence of the uncertainty. In light of the most recent indications from the Supreme Court, Dan River's action for equitable relief under RICO might well fail to state a claim. *See, e.g., Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Touche Ross & Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979).

We next proceed on the assumption that the RICO statute does afford a remedy of equitable relief to private parties. Doing so, we begin with the linchpin of Dan River's theory—the claim that Bayswater is an unregistered, and hence unlawful, investment company. As Dan River freely acknowledges, it is that claim which sets its RICO argument apart from a similar, albeit unsuccessful, one levied against Icahn in an earlier takeover struggle. *Marshall Field & Co. v. Icahn,* 537 F.Supp. 413 (S.D.N.Y. 1982). The *Marshall Field* court regarded as altogether dubious the RICO charges against Icahn. Dan River maintains, however, that, by adding Bayswater to the picture, different conclusions must follow.

We see a difference, but not a difference which suggests that Dan River's claim is

---

**13.** An unregistered investment company is forbidden from engaging in any business affecting interstate commerce. 15 U.S.C. § 80a–7(a)(4). Affiliated persons—including directors, officers, employees, and shareholders—are prohibited from entering into transactions jointly with the investment company unless SEC approval is secured. 15 U.S.C. § 80a–17(d). Those two prohibitions, of course, are fundamental to Dan River's theory. Carl C. Icahn, as a director of Bayswater, could not employ Bayswater in his takeover ventures if Bayswater was an investment company and SEC clearance was not first obtained.

likely to prevail. First, it is far from clear that Bayswater is in fact an unlawfully unregistered investment company. Both parties have filed lengthy analyses, and Bayswater's status under the Investment Company Act may well turn, in the end, on difficult and complicated real estate valuations.[14] At such an early stage, we are unprepared to say Dan River has stated a compelling case against Bayswater.

There are many more bridges under which Dan River must flow to make its case. It will be difficult to prove criminal intent with regard to Bayswater's failure to register with the SEC. Criminal intent, is, of course, necessary to either mail fraud or securities fraud. *See United States v. Mandel,* 591 F.2d 1347, 1363 n. 11 (4th Cir.1979), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980) (mail fraud); *United States v. Vandersee,* 279 F.2d 176, 179 (3d Cir.1960), *cert. denied,* 364 U.S. 943, 81 S.Ct. 385, 5 L.Ed.2d 374 (1961) (securities fraud). The evidence indicates that Carl C. Icahn and his attorneys constantly monitored the holdings of Bayswater in a serious attempt to prevent Bayswater from becoming an investment company. Too, it appears that Carl C. Icahn acted pursuant to bona fide legal opinions that Bayswater was not an investment company when he enlisted the company in his earlier takeover ventures. In the face of such evidence, it would seem extremely unlikely that Dan River will be able to prove the predicate acts of mail or securities fraud. *See, e.g., Bisno v. United States,* 299 F.2d 711, 719–20 (9th Cir.1961), *cert. denied,* 370 U.S. 952, 82 S.Ct. 1602, 8 L.Ed.2d 818 (1962) (while not an absolute defense, reliance upon legal counsel is evidence of good faith which rebuts inferences of criminal intent; the defendant is entitled to such a jury instruction).

As our discussion of Dan River's Rule 10b–5 claim indicated, it will not be easy to find predicate offenses in Icahn's prior use of the ultimatum strategy—whether the theory be one of securities fraud or extortion. We do not accept that Icahn's candid recognition and expression of the facts of life in corporate capitalism—namely, that management, in its own interests or in the interests of its shareholders, might be tempted to prevent a takeover by either buying out the bidder or securing a "white knight" to do so—is illegal.

Finally, we note the mounting controversy in the federal courts over the proper limits, if any, upon the use of RICO in cases far removed from the context which Congress had in mind when it enacted the statute. Congress was out to attack the problem of organized crime, not the problems of corporate control and risk arbitrage. We of course make no attempt to resolve the dispute here and now. We do not propose to enter the fray. We only note that the reach of RICO is itself a troubling issue which adds to the problems Dan River will face at trial. *See generally* Note, *Civil RICO: The Temptation and Impropriety of Judicial Restriction,* 95 Harv.L.Rev. 1101 (1982).

### E

The fifth and final claim we must assess is Dan River's allegation that Icahn intends to "loot" the company in violation of Virginia corporation law. The gravamen of the complaint is that Icahn will, upon obtaining control of the company, convert Dan River's assets into cash and then divert that cash to its own use. It is apparent that the district court's "sterilization" order was designed primarily to prevent just that from happening.

To find a violation under state corporation or fiduciary duty laws, we would have

---

**14.** Bayswater may qualify as an investment company in one of two ways. The first is if the company is primarily engaged in the business of investing in securities. 15 U.S.C. § 80a–3(a)(1). Five factors have been deemed relevant to that standard—with special attention to the composition of the company's assets and the sources of the company's income. *See,* *e.g., SEC v. Fifth Avenue Coach Lines, Inc.,* 289 F.Supp. 3 (S.D.N.Y.1968), *aff'd,* 435 F.2d 510 (2d Cir.1970). The second test of the company's status as an investment company involves a bright-line standard: if more than 40 percent of the company's assets consist of "investment securities," it must register. 15 U.S.C. § 80a–3(a)(3).

to be presented with evidence that Icahn intends to "self-deal" with Dan River's assets. It is not enough to allege that, upon seizing control of the company, Icahn might engage in extraordinary transactions to make Dan River more "liquid." After all, Virginia law indubitably permits those in control of a corporation to sell all or substantially all of the corporate assets, Va. Code § 13.1–77, to merge the corporation with another, Va.Code § 13.1–71, or even to dissolve the company, Va.Code § 13.1–81. Of course, Virginia imposes procedural requirements which must be followed and gives minority shareholders measures of protection. Icahn has from the very outset asserted that such laws will be obeyed.

The speculative allegation that Icahn will go further and actually divert corporate assets to personal use is a serious claim which requires serious proof. The proof before us now, however, is virtually non-existent. The thrust of Dan River's evidence is that Icahn's enlistment of Bayswater in its own takeover ventures smacks of self-dealing, and that it is right to assume that Icahn will do the same with Dan River.

A few observations will suffice to show the inherent weakness of Dan River's position. First, the fact that a party has done wrong before is generally an unapproved way of proving that the party will commit another wrong in the future. *See, e.g., United States v. O'Connor,* 580 F.2d 38 (2d Cir.1978) (reversing conviction obtained through use of evidence of prior crimes). Second, it is far from clear that what Icahn did in the past was unlawful. We are presented with no prior adjudications of either criminal or civil liability with regard to Icahn's dealing with Bayswater. And, assessing the facts at face value, it would appear that Icahn only did with Bayswater what any party in control of a corporation is entitled to do—that is, direct the company into more aggressive, takeover-minded transactions.

On the slim record before us, we are exceedingly reluctant to permit allegations of intended future wrongdoing—allegations easily made under the absolute privilege enjoyed by a litigant before the courts—to come in the way of Icahn's presumptively legitimate attempts to obtain control of a company in which it owns shares. Those allegations are short on supporting evidence. If and when the fear of wrongdoing should ripen to imminence, Dan River shareholders will have ample time and opportunity to seek relief from the courts.

BUTZNER, Senior Circuit Judge, dissenting:

I

*Likelihood of Success*

I cannot accept Icahn's [1] defense that its failure to disclose Icahn Capital's contingent liability of $5,000,000 is immaterial. I base my conclusion on the following propositions:

1. The Williams Act requires full disclosure for the protection of shareholders who do not tender, as well as those who do. S.Rep. No. 550, 90th Cong., 1st Sess. 2–3 (1967). *See Piper v. Chris-Craft,* 430 U.S. 1, 22–23, 97 S.Ct. 926, 939–40, 51 L.Ed.2d 124 (1977).

2. In its tender offer, Icahn represented that it intended to merge Dan River with Icahn Capital through an exchange of the merged company's debentures for Dan River stock. Therefore, information about the financial status of Icahn Capital is material to Dan River shareholders who did not tender their stock.

3. The $5,000,000 contingent liability represents approximately 39% of Icahn Capital's $12,742,219 net worth.

4. Regulations promulgated by the SEC pursuant to 15 U.S.C. § 78n(d)(1) required Icahn Capital to file a financial statement in accordance with generally accepted accounting principles. *See* 17 C.F.R. § 240.14d–100, Item 9, and § 210.4–01(a)(1).

5. Under generally accepted accounting principles, substantial contingent liabilities, such as guarantees of indebtedness, must be

---

1. Unless the context otherwise indicates, appellants are identified collectively as "Icahn."

disclosed. *See* Financial Accounting Standards Board, Statement of Financial Accounting Standards No. 5 (1975), *reprinted in* Financial Accounting Standards: Original Pronouncements 732–35 (1979).

6. By the terms of the regulations, Icahn's failure to report its contingent liability in accordance with generally accepted accounting principles means its disclosure statement is "presumed to be misleading or inaccurate." *See* 17 C.F.R. § 210.4–01(a)(1); *cf.* In Matter of Ford, [1978–1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 72,274, at 62,743 (August 24, 1978).

7. Because Carl C. Icahn controls both the debtor and the guarantor, the contingent liability can readily be converted into an actual liability to protect the debtor at the expense of the guarantor, Icahn Capital. Icahn has given no assurances that the $5,000,000 contingent liability will be subordinated to the debentures Icahn Capital proposes to issue to Dan River shareholders. Under these circumstances, the guaranty should have been disclosed pursuant to 17 C.F.R. § 210.4–08(1) (related party transactions).

Title 15 U.S.C. § 78n(e) proscribes the omission of any material fact in connection with a tender offer. I conclude that Dan River is likely to be able to prove that Icahn violated this statute by failing to disclose Icahn Capital's contingent liability and by failing to explain that the guaranty was a transaction with a related company that might not be subordinated to the proposed debentures.

Dan River introduced evidence that Icahn knew that the conditions mentioned in its $15–$18 tender offer would never be satisfied. The vice of this dual price offer is Icahn's representation that it was making an $18 offer which it knew it would never have to pay. Unless Icahn can successfully rebut Dan River's proof, Icahn will be shown to have induced shareholders to tender stock at $15 by creating the impression that the $18 offer was bona fide when in fact it was wholly illusory. Icahn's defense that the $15–$18 offer was cured by substitution of a $16.50 offer goes merely to the question of causation and harm. The answer will require the analysis of evidence that is not yet available.

Title 15 U.S.C. § 78n(e) makes it unlawful for a person to engage in any fraudulent, deceptive, or manipulative acts in connection with a tender offer. Although the circumstances of this dual price offer present an issue of first impression, I conclude on the basis of the present record that Dan River is likely to be able to establish that Icahn violated § 78n(e). *Cf. Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976).

On the basis of the present record, I am unable to decide whether Dan River is likely to recover treble damages on the ground that Icahn violated the Racketeer Influenced and Corrupt Organizations Act. In the short time this action has been pending, Dan River was able to discover that Icahn engaged in a number of questionable transactions, but proof of willful mail or wire fraud that produced funds for this tender offer is inconclusive. The record does not yet disclose the underlying facts on which Icahn predicates its defense of advice of counsel. Certainly, however, Dan River has standing to assert this claim. *See* 18 U.S.C. § 1964(c). It should not be forestalled by Icahn's avowed intention to dismiss this action if it gains control of the company. Finally, in agreement with a recent commentator, I cannot subscribe to the notion that it is the function of the courts to exclude white-collar, corporate crime from the liability imposed by § 1964(c). Complaints about the scope of the Act should be addressed to Congress. *See* Civil RICO: The Temptation and Impropriety of Judicial Restriction, 95 Harv.L.Rev. 1101, 1115–21 (1982).

Reliance on *Piper v. Chris-Craft Industries,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1927), to defeat Dan River's claim for injunctive relief for violation of 15 U.S.C. § 78n(e) is misplaced. *Piper* held that the statute did not confer on a tender offeror a right of action for damages. The Court was not dealing with injunctive relief. *See* 430 U.S. at 47 n. 1, 97 S.Ct. at 952 n. 1. The

distinction between damages and injunctive relief is critical. *See Mobil Corp. v. Marathon Oil Co.,* 669 F.2d 366, 370–73 (6th Cir.1981).

In sum, I conclude that Dan River has standing to sue for equitable relief under 15 U.S.C. § 78n(e) and for monetary relief under 18 U.S.C. § 1964(c). Although the probability of recovery of damages under § 1964(c) is inconclusive, I believe that Dan River's proof of likelihood of success on the other issues I have discussed satisfies this aspect of the requirements for interlocutory relief.

## II

### *Irreparable Harm*

Icahn's tender offer states:

Prior to the completion of this offer, the Purchasers intend to call a shareholders meeting to be held subsequent to the purchase of the shares in order to elect their designees to the Company's Board ... so that Purchasers' designees constitute a majority of such directors.

Carl C. Icahn testified that upon assuming control of the company, he would dismiss this action. He proposes to do this, of course, before judgment can be entered.

Unlike management in some takeover litigation, Dan River has supported its allegations of wrongdoing with evidence that, at this stage of the proceedings, appears to be sufficient to withstand a motion for summary judgment. Consequently, I conclude that Icahn's dismissal of this action before the legality of its assumption of control can be litigated will irreparably harm Dan River and its shareholders.

In contrast, Icahn's harm is not irreparable. The court's order would delay Icahn's assumption of control of the company. Icahn does not claim that this delay will divest it of financing or cause the withdrawal of any of its joint venturers. The

argument that the order would thwart Dan River's shareholders who wished to tender stock, or otherwise depress the tender of shares, lacks evidentiary proof; it is speculative. The protest that the order unduly favors Dan River's management ignores the severe restrictions that the order places on the company's officers and directors as a condition to the continued existence of the injunction.[2]

I therefore conclude that Dan River satisfies the balance of hardship test for interlocutory relief.

## III

### *The Public Interest*

In a paper soliciting partners for C.C.I., a member of the Icahn group seeking control of Dan River, Icahn & Co. stated:

It is our contention that sizable profits can be earned by taking large positions in "under valued" stocks and then attempting to control the destinies of the companies in question by:

a) trying to convince management to liquidate or sell the company to a "white knight";

b) waging a proxy contest, or;

c) making a tender offer and/or;

d) selling back our position to the company.

. . . . .

We are now forming a partnership for the purpose of acquiring large positions in a limited number of companies and, once this is accomplished, attempt to use the methods described above to realize the large potential profits that exist.

Icahn & Co. then cited returns on equity of 250% and 200% in two of its recent ventures.

The district court was aware of Icahn's method of operation and its intention to liquidate the company by sale of its assets,

---

**2.** The order states:

Provided, however, that during the existence of this Preliminary Injunction Dan River, its Board of Directors and officers shall conduct business as usual; will make no disposition of assets out of the ordinary course of business; will pay only regular dividends and will make no new issues of stock. A violation of the provision shall be grounds for dissolution of this Injunction and subject Dan River to damages under its bond.

if a "white knight" did not appear to buy its stock at a premium price. After noting that Dan River had raised substantial questions of law and fact, the court said:

> I also see that we have an employee force of something like twelve thousand people, I think forty-five thousand stockholders, fifty percent of which are under hundred share owners. We've got a lot of small people out there that need to be protected, and from the public policy standpoint, I think that is a major consideration.

There are two aspects to the question of public interest raised by the district judge. The first is whether Icahn's goals are in the public interest. Congress has answered this question, for neither the Williams Act nor other regulatory statutes proscribe them.

The second aspect of public interest concerns the means Icahn has employed to advance its goals. The Williams Act and other regulatory laws set forth explicitly what means may be lawfully used in a tender offer. It is in the public interest to determine whether Icahn has violated these laws. Icahn should not be permitted to thwart this inquiry by assuming control and dismissing this action. I conclude, therefore, that the public interest is served by the preservation of the status quo until the question of the legality of Icahn's conduct can be definitively resolved. While I agree with the suggestion that a shareholders' suit might ultimately prevent Icahn from dismissing this action, I am not persuaded that the district court abused its discretion by maintaining the status quo rather than by relying on an action which has yet to be filed.

### IV

#### The Remedy

The district court was concerned about both Icahn's freedom to pursue its tender offer and Dan River's existence pending resolution of the issues presented by this case. Therefore, it fashioned its decree to maintain the status quo. There can be no question about the effectiveness of the decree. It temporarily restricts Icahn and Dan River from taking steps that will irreparably harm the other. The decree should not be faulted as premature. Maintenance of the status quo is always prophylactic; it is designed to forestall future acts that can be more equitably prevented than remedied. The district court's exercise of discretion fully comports with the Supreme Court's description of proper equity practice:

> The historic injunctive process was designed to deter, not to punish. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. *Hecht Co. v. Bowles*, 321 U.S. 321, 329 [64 S.Ct. 587, 591, 88 L.Ed. 754] (1944).

I would affirm the district court.

