James L. ANDERSON, et al., Plaintiffs,

v.

D.P. BOOTHE, Jr., et al., Defendants,

and

Investors Diversified Services, Inc., Nominal Defendants.

No. Civ. 4–79–266.

United States District Court, D. Minnesota, Fourth Division.

Nov. 14, 1984.

---

John A. Cochrane, Mary F. Seymour, St. Paul, Minn., for plaintiffs.

Harold Field, George McGunnigle, Jr., Minneapolis, Minn., for defendants Alleghany Corp., Alleghany-IDS Corp., John J. Burns, Jr., Allan P. Kirby, Jr. and F.M. Kirby.

Peter Dorsey, Robert A. Schwartzbauer, Melissa J. Draper, Minneapolis, Minn., for defendants D.P. Boothe, Jr., Charles R. Orem, Stuart R. Silloway and Paul Woodberry.

Stephen T. Refsell, Minneapolis, Minn., Theodore Gewertz, New York City, for defendants Salomon Bros.

## MEMORANDUM OPINION AND ORDER

WEINER, District Judge.[1]

This action, commenced in June 1979, arises out of the merger of Investors Diversified Services, Inc. ("IDS") into a wholly owned subsidiary of Alleghany Corporation ("Alleghany") on May 10, 1979. The merger proposal was presented by Alleghany to the Board of Directors of IDS on September 20, 1978. At that time, Alleghany owned approximately 56.4 percent of the outstanding voting stock and 37 percent of the equity of IDS. Under the terms of the merger proposal, holders of IDS Class A common stock could elect to receive either one-half of a share of Alleghany common stock and one share of a new class of Alleghany preferred stock or $40 in cash for each share of Class A common stock. Holders of IDS Class B

---

**1.** Judge Weiner, a district court judge in the Eastern District of Pennsylvania, is sitting by designation.

common stock could elect to receive, for each share, one-eighth of a share of Alleghany common stock and one-fourth of a share of the new class of Alleghany preferred stock or $10 in cash. The merger was contingent upon the approval of the shareholders of Alleghany and IDS.

After the merger proposal was submitted by Alleghany, a committee of the Board of Directors of IDS ("Committee") was formed to consider the merger. On October 20, 1978 the Committee engaged Salomon Brothers ("Salomon") to analyze the proposal and render an opinion as to whether the consideration offered by Alleghany for the IDS stock was fair from a financial point of view to shareholders of IDS other than Alleghany. On November 16, 1978, Salomon reported to the Committee that the merger proposal was fair. On the same day, the Committee concluded that the proposal was fair, whereupon the full IDS Board of Directors authorized the submission of the Alleghany offer to the IDS stockholders. Salomon reiterated its opinion in a letter addressed to the Committee and IDS dated March 29, 1979. This letter was attached to the Joint Proxy Statement issued on the same day. At a stockholder's meeting on April 26, 1979, the merger was approved and thereafter effectuated.

The *Anderson* plaintiffs comprise a class representing the minority shareholders of the "Old" IDS company. The defendants in this case are as follows: (1) the corporate defendants include Alleghany, IDS (a nominal defendant), and Alleghany-IDS Corporation ("Mergerco"), the wholly owned subsidiary of Alleghany into which IDS was merged; (2) director and officer defendants include (a) F.M. Kirby, Allan P. Kirby, Jr. and John J. Burns, Jr., who, from May 1977 until the time of the merger, were directors of both Alleghany and IDS as well as members of the Executive Committee of IDS. F.M. Kirby was Chairman of the Board of both Alleghany and

IDS and A.P. Kirby was Chairman of the Executive Committee of both corporations; and (b) Charles R. Orem, D.P. Boothe, Jr., Stewart F. Silloway and Paul Woodberry, who were also members of the Board of Directors of IDS from May 1977 until the time of the merger. Orem was also the company's Chief Executive Officer and a member of its Executive Committee; and (3) Salomon, whose role in the merger was described above.[2]

The plaintiffs seek to assert liability against the defendants for alleged violations of Sections 10(b) and 14(a) of the Exchange Act of 1934 and Rules 10b–5 and 14a–9 promulgated thereunder. They also assert pendent claims arising under the laws of the State of Delaware. Presently before the court are the motions of the defendants for summary judgment and the motion of the plaintiffs for partial summary judgment on their pendent Delaware claims. Upon consideration of the extensive briefs filed in this matter and the oral argument held before the court on September 26, 1984, the motions are denied for the reasons which follow.

A court may grant a motion for summary judgment "only when, viewing the facts and inferences that may be derived therefrom in the light most favorable to the nonmoving party, the court is convinced that there is no evidence to sustain a recovery under any circumstances." *Buller v. Buechler*, 706 F.2d 844 (8th Cir.1983) (citations omitted). The moving parties have the burden to establish that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. *Id.* (citation omitted).

### FEDERAL SECURITIES CLAIMS

Section 14(a) provides:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce

---

**2.** Originally included as defendants in this action were the former outside directors of IDS. Four out of five of these directors comprised the committee which was established to evaluate

the merger proposal. On February 12, 1980, the court approved, *nunc pro tunc,* the plaintiffs' dismissal of the outside directors.

or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title.

15 U.S.C. § 78n(a).

Rule 14a–9 provides:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading. 17 C.F.R. § 240.14a–9.

Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.   15 U.S.C. § 78j(b).

Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to employ any device, scheme, or artifice to defraud,

(2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

The plaintiffs contend that the Joint Proxy Statement of Alleghany and IDS ("Joint Proxy Statement") contained in excess of eighty misstatements or omissions. Defendants Alleghany, Burns and the Kirbys (the "Alleghany-Kirby defendants") contend that: (1) some of the alleged misstatements or omissions were, in fact, disclosed in the Joint Proxy Statement; (2) some of the alleged omissions need not have been disclosed because they did not render affirmative statements in the Joint Proxy Statement false or misleading; (3) some of the alleged omissions relate to the motivations behind various management actions, financial or business projections, or asset appraisals and, as such, are not actionable omissions under the federal securities laws; and (4) some of the misstatements or omissions are immaterial as a matter of law.

Defendants Boothe, Orem, Silloway and Woodberry (the "IDS director defendants") essentially restate the arguments of the Alleghany-Kirby defendants.   However, they also claim that they are not liable under the federal securities laws because they did not personally participate in the preparation of the Joint Proxy Statement and simply relied upon the recommendation of the Committee in voting to submit the merger proposal to the stockholders of IDS.   Moreover, they claim that they cannot be held liable under Delaware law, because their actions in connection with the

merger were taken in the exercise of their sound business judgment.

Defendant Mergerco claims that it is entitled to summary judgment because most of the activities which are the subject of the plaintiffs' complaint occurred after the company's formation on February 6, 1979. While Mergerco concedes that the Joint Proxy Statement was issued after its formation, it contends that it did not participate in the proxy's preparation.

The essence of Salomon's contention that it is entitled to summary judgment is that its fairness opinion was based upon its good faith reliance on the information provided to it by Alleghany and IDS. Salomon denies that it had any intent to violate securities laws. It also denies knowledge of and substantial assistance in any securities law violations by the other defendants.

■■■ Whether brought pursuant to Section 14(a) or Section 10(b), an action based on an allegedly misleading proxy statement must allege that the proxy contained misstatements or omissions that are material. *Golub v. PPD Corporation,* 576 F.2d 759 (8th Cir.1978). The relevant inquiry, in determining the materiality of a given misstatement or omission, is whether "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Elaborating on this standard the *TSC* court stated that:

> The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts. In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and

these assessments are peculiarly ones for the trier of fact. Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment. *Johns Hopkins University v. Hutton,* 422 F.2d 1124, 1129 (CA4 1970). See *Smallwood v. Pearl Brewing Co.,* 489 F.2d, [579] at 604; *Rogen v. Ilikon Corp.,* 361 F.2d 260, 265–267 (CA1 1966).

*Id.* at 449, 96 S.Ct. at 2132 (footnote omitted). We agree with the court in *Valente v. Pepsico, Inc.,* 454 F.Supp. 1228 (D.Del. 1978) that, "This statement suggests that a court should be cautious in taking a question of materiality away from the trier of fact ... by finding that an omission is material or not material as a matter of law." 454 F.Supp. at 1234 (footnote omitted). We find, in the case *sub judice* that at least some of the plaintiffs' claimed misstatements or omissions meet the standard of materiality as established by *TSC.* Some examples include, but are not limited to, the following:

■■■ 1. Under the heading of "Opinions of Investment Bankers," the Joint Proxy Statement disclosed that, "For its services in rendering such opinion, Salomon has received a fee of $250,000 from IDS and is entitled to receive an additional fee of $150,000 payable because such opinion has been made publicly available." [Joint Proxy Statement at 27.] The plaintiffs contend, however, that, "Salomon Brothers knew it would not receive the additional $150,000 fee unless it opined that the Alleghany offer was fair." [Plaintiffs' Response to Contention Interrogatory 33(a)]. In support of this allegation, the plaintiffs cite the deposition testimony of Robert A. Bernhard, who was the Salomon senior partner in charge of the IDS Committee's engagement of Salomon Brothers. Bernhard stated that, "My understanding is that if we had found it [the merger proposal] was not fair, we would not have received the second payment." [Deposition

of Robert A. Bernhard, March 2, 1984 at 21].

The defendants, on the other hand, cite to the affidavit of Michael J. Zimmerman, who was responsible for Salomon's analysis of ISA and IDS advisory, two, of the five component business entities which formed IDS. The Zimmerman affidavit, in essence, states that the public dissemination of Salomon's opinion was not contingent upon deeming the merger proposal fair. [Affidavit of Michael J. Zimmerman, September 17, 1984]. The defendants also point to the engagement letter from Salomon to IDS and the Committee which states, in pertinent part, "In consideration of our engagement hereunder, IDS agrees to pay us a fee of $250,000. If our opinion is made publicly available or used in any document that is publicly available, IDS will pay us an additional fee of $150,000." [Plaintiffs' Exhibit "PX" 223].

The defendants cite *Radol v. Thomas*, 534 F.Supp. 1302 (S.D.Ohio 1982), a case arising out of the merger of Marathon Oil Company into United States Steel, Inc., for the court's rejection of an argument that a proxy statement was misleading because it failed to disclose the contingent nature of an investment banker's fees. The court dismissed this argument not because it found the alleged omission immaterial, but because it found that the stockholders were advised in the proxy statement that the fee contract had been disclosed in a schedule 14D–9 form filed with the SEC. 534 F.Supp. at 1315. Because a contingent fee arrangement between a target company and its investment banker could have the potential to taint the fairness opinion of the investment banker, we conclude that the reasonable shareholder would consider information regarding a contingent fee arrangement of obvious importance in deciding how to vote on a merger proposal.

Unlike *Radol*, however, the contingency fee issue in the case *sub judice* presents the court with a triable issue of fact. As discussed above, each side has presented depositions, affidavits, or documentation tending to substantiate their positions. Salomon, in particular, has attempted to discredit the Bernhard deposition by stating that he merely testified to his present understanding of the agreement five years after it was entered into. Moreover, Salomon argues that Bernhard, not being a lawyer, can have no legal understanding of the fee arrangement and cannot speak for Salomon's understanding at the time of the agreement. The deposition, on its face, does not clearly indicate whether Bernhard was testifying from his past or present knowledge of the agreement. However, as the senior partner in charge of the Committee's engagement of Salomon, Bernhard's testimony is at least probative of Salomon's understanding of the fee arrangement. Thus, viewing the facts and influences in light most favorable to the non-moving party on this motion for summary judgment, the court cannot dismiss the claim.

2. Regarding the Committee's choice of an investment banker for the purpose of rendering an opinion on the merger proposal, the plaintiffs claim that the proxy statement omitted and should have disclosed the following information:

The First Boston Corp.'s selection as investment banker for IDS and/or the Committee.

Alleghany's refusal to proceed with the merger proposal if the First Boston Corp. continued as the investment banker for IDS and/or the Committee.

The Paul Weiss Rifkind Wharton Garrison [a law firm retained by the Committee] opinion that there was no legal impediment to the First Boston Corp. continuing its representation.

The termination of the First Boston Corp.

[Plaintiffs' Response to Contention Interrogatory 33(a)].

In support of these contentions, the plaintiffs cite a number of documentary and deposition exhibits. [e.g. PX 20, 21, 22, 23; Deposition of Paul J. Newlon, March 5, 1984]. PX 21 consists of Charles Orem's (Chief Executive Officer of IDS) dictated notes of a conversation he had with Fred Kirby (Chairman of the Board of both Alle-

ghany and IDS) on September 28, 1984. The first three full paragraphs of these notes are set forth below:

Fred [Kirby] stated that the primary purpose of his call was to make sure that I understood Alleghany's position with respect to any possible negotiation of the price that had been proposed in the merger proposal. He stated that the price was not negotiable under any circumstances and that he had difficulty agreeing to the $40 price and would not go any higher. He further stated that Alleghany was not interested in any alternatives which might be suggested by an investment banker selected by the independent IDS Directors. He requested that I make his position very clear to the independent IDS Directors.

He then asked me what kind of fee arrangement we were proposing to have with the investment banker to be selected. I told him that I had had discussions with First Boston and asked them to submit a fee proposal based on an opinion that did not have to go to print and one that would have to go to print in the merger documents. He suggested that we should have an incentive fee arrangement which would provide for a higher fee to the investment banker if the merger was consummated. I told him that I did not agree with this approach and had doubts whether any investment banker would agree, taking into account the delicate position in which they were placed. He also pointed out the importance of keeping the fee as low as possible. He further commented that the assignment to the investment banker should be only to determine whether the proposal was fair. He did not see any need for the investment banker to provide the independent Directors with an opinion as to what they considered to be a fair price. After this discussion he advised me that they had just received an opinion from Donovan Leisure [counsel for Alleghany] which stated that Alleghany would be incurring an unnecessary legal risk if IDS retained First Boston as its investment banker. He, in effect, stated that

First Boston was unacceptable to Alleghany. He used the illustration that even if First Boston did render an opinion that the price was fair, Alleghany would not go forward with the merger proposal. He was careful to point out that he was not telling the independent Directors of IDS that they should not select First Boston. He simply said that if they did Alleghany would not go forward with the merger proposal.

Alleghany contends that it did not want First Boston as the Committee's investment banker because First Boston had worked for Alleghany in the recent past and Alleghany's counsel feared that the selection of First Boston would increase the likelihood of litigation in connection with the merger proposal. Alleghany also contends that the Committee's choice of Salomon over First Boston as its investment banker is immaterial because the plaintiffs have not shown that the Committee's selection process worked any "undue influence" on Salomon.

The Joint Proxy Statement described the function of the Committee "to consider on behalf of IDS and its shareholders other than Alleghany the terms, fairness and advisability of the proposal." [Joint Proxy Statement at 25]. The IDS directors who comprised the Committee were characterized in the proxy as having no employment or substantial stock interest in IDS or Alleghany. [Id. at 23, 25]. The obvious purpose of this characterization was to make it appear as though the Committee could exercise independent judgment in its evaluation of the merger proposal. The plaintiffs' discovery at least raises the inference that the Committee was not independent enough to choose its own investment banker. The court cannot conclude, as a matter of law, that the Committee's process of selecting an investment banker is immaterial where evidence indicates that the process may have seriously undermined the Committee's independence. To the extent that the defendants may be able to produce evidence (e.g. PX 23) indicating that Alleghany was interested in preserving the in-

dependence of the Committee, the court is presented with a triable issue of fact.

■ 3. The plaintiffs contend that the names of the IDS directors who would be asked to serve on the Alleghany Board after the merger or the factors for their selection should have been disclosed. [Plaintiffs' Response to Contention Interrogatory 33(a)]. On February 5, 1979, defendant F.M. Kirby wrote to the IDS directors and informed them that they were being considered for positions on the Alleghany Board. [PX 131]. The proxy statement, issued March 29, 1979, actually disclosed that:

> If the Merger is consummated, the Alleghany Board of Directors currently intends to consider whether to invite one or more IDS directors, including IDS directors who served on the Committee which considered the fairness of the Merger proposal, to serve on the Alleghany Board. Alleghany has not asked any of the IDS directors whether they would be willing to serve on the Alleghany Board after the Merger.

[Joint Proxy Statement at 66]. In his February 5 letter, Kirby stated that the timing of the decision to name IDS directors to the Alleghany Board "almost certainly will not be made before the merger, and may very well not be made for some months thereafter." [PX 131]. However, "The date the merger was consummated [May 10, 1979] Fred Kirby communicated to the directors that he would like them to continue and those he did not want to continue, such as Mr. Schwartzbaum's [sic] client's, not to continue or go to the Allegheny [sic] board." [Transcript of Hearing on Motions for Summary Judgment at 31].

· The fact that some IDS directors were chosen to serve on the Alleghany board at a time contemporaneous with the merger's consummation may give rise to the inference that the Alleghany board decided which IDS directors it would invite on the board prior to the shareholder's approval of the merger. This inference is bolstered by Kirby's February 5 letter expressing a likelihood that a decision in this matter would not be reached until "some months" after the merger. If the decision as to which IDS directors would be invited on the Alleghany board was made prior to shareholder approval, such information would have been important to the IDS shareholders in determining how much weight to give to the IDS directors' recommendation to approve the merger proposal. Thus, the court has been presented with a triable issue of material fact and cannot dismiss this claim.

The defendants argue that rather than alleging specific actionable misstatements or omissions, the plaintiffs have alleged acts constituting corporate mismanagement or a breach of fiduciary duty which do not fall within the reach of the federal securities laws under the rule announced by the Supreme Court in *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). In *Santa Fe,* the court held that a complaint which, in essence, alleged the unfair treatment of minority shareholders by a fiduciary, but which failed to allege a material misrepresentation or a material failure to disclose was not actionable under Section 10(b) and Rule 10b–5. 430 U.S. at 474–480, 97 S.Ct. at 1301–1304. In *Golub, supra,* the Eighth Circuit stated that the *Santa Fe* decision "may well be applicable in a case involving § 14(a) and Rule 14a–9." 576 F.2d at 764. In the case *sub judice,* however, we have found that at least some of the plaintiffs' claimed non-disclosures meet the standard of materiality as established by *TSC, supra.* We, therefore, decline to dismiss the Section 14(a) and the Section 10(b) counts.

Having determined that at least some of the plaintiffs' claims are actionable non-disclosures which present triable issues of fact, the court does not believe that a useful purpose would be served at this juncture by examining each of the over eighty claimed misstatements and omissions and rendering a decision as to the materiality of each one. As the court observed in *Hundahl v. United Benefit Life Company,* 465 F.Supp. 1349 (N.D.Tex.1979) after noting that only one of the acts alleged by the

plaintiff as deceptive was actionable under federal securities law:

> ... while the separate claims viewed in isolation may not amount to such nondisclosure as is within the reach of federal law, certainly there may be a point where the facts disclosed by corporate management, though true, are so devoid of explication or other supporting data that the overall disclosure becomes deceptive, and a claim is stated under the federal securities law. The line between nondisclosures that amount only, at most, to mismanagement and nondisclosures so significant that they constitute deception actionable under Rule 10b–5 cannot be drawn with precision. To be sure, there is a measure of arbitrariness in drawing it, for the factors that must be considered in making the determination are not quantitatively measurable.

465 F.Supp. at 1365. Despite this observation, the court proceeded to dismiss all claims under Rule 10b–5 except the one it found actionable because, "To hold otherwise would eviscerate the obvious purpose of the *Santa Fe* decision, and to permit evasion of that decision by artful legal draftsmanship." *Id.* at 1366.

■ The *Santa Fe* court simply held, however, that an alleged "breach of fiduciary duty by majority stockholders, without any deception, misrepresentation, or nondisclosure," does not violate Section 10(b) and Rule 10b–5. 430 U.S. at 476, 97 S.Ct. at 1302. In light of admonishments in *Santa Fe, Id.* at 475–476, 97 S.Ct. at 1301–02, and, more recently, in *Herman & MacLean v. Huddleton,* 459 U.S. 375, 386–387, 103 S.Ct. 683, 690, 74 L.Ed.2d 548 (1983) (holding that "the availability of an express remedy under § 11 of the 1933 Act does not preclude defrauded purchasers of registered securities from maintaining an action under § 10(b) of the 1934 Act." 459 U.S.

at 387, 103 S.Ct. at 690) that the securities laws should be construed flexibly so as to effectuate their remedial purposes, we do not construe the *Santa Fe* decision as foreclosing a plaintiff from all mention of breaches of fiduciary duty where specific acts of deception are also alleged. We must acknowledge that as long as some of the plaintiffs' claims are material, the trier of fact may need to hear some claims that, standing alone, are not actionable in order to determine whether all of the claims, in their totality, rise to a level of overall deception that states a claim under the federal securities laws.[3]

Because the essential basis of the Alleghany-Kirby defendants' motion is that the plaintiffs' claims are non-actionable or immaterial, the above discussion constitutes an effective denial of their motion. However, the IDS director defendants and Salomon raise some further issues which must be addressed.

■ The IDS director defendants acknowledge that their duty was to see that the facts material to the merger proposal were disclosed. [Memorandum in Support of IDS Director Defendants' Motion for Summary Judgment at 44]. However, assuming, *arguendo,* that the proxy contained material nondisclosures, they argue that they had no knowledge of their existence and were not negligent in failing to discover them. At least with respect to one alleged material nondisclosure, the circumstances surrounding the Committee's choice of an investment banker, the plaintiffs have attempted to prove this claim through the notes of IDS director defendant Orem.[4] These notes clearly show that Orem was aware that Alleghany did not want First Boston as IDS's investment banker. Moreover, to the extent that the defendants have acknowledged that negli-

---

**3.** This court is sensitive to the concern expressed by *Hundahl* that artful legal draftsmanship should not be used to reach beyond the intended scope of Section 10(b). Defendants should not be burdened with litigating meritless claims. In the case *sub judice,* however, the burden of litigating otherwise nonactionable

claims which may or may not reveal a disclosure which is deceptive in its totality is minimized because many of such claims may be properly raised pursuant to the plaintiffs' challenge of the merger's fairness under Delaware law.

**4.** See p. 437, *supra.*

gence may be the appropriate standard of liability for Section 14(a) claims, the court believes that the trier of fact should determine whether the defendants exercised ordinary care with respect to their review of the proxy statement.

■ The basis of Salomon's motion for summary judgment is that it neither had knowledge of nor substantially assisted in the alleged fraud of the other defendants. However, as the court's discussion of the alleged contingency fee arrangement makes clear, the plaintiffs have raised a triable issue of fact with respect to the extent of Salomon's knowledge.[5]

## STATE LAW CLAIMS

■ The plaintiffs, the IDS director defendants, and Salomon have each requested a judgment in their favor based on the merits of the claims arising under Delaware law.[6] The plaintiffs base their motion on the following nondisclosures: (1) a report of Alleghany's investment banker, Merrill Lynch White Weld Capital Markets Group ("Merrill Lynch") which purportedly placed a value of $43.04 on Class A shares of IDS stock as of December 31, 1978 and (2) the alleged contingency fee arrangement between Salomon and the Committee. The plaintiffs contend that these nondisclosures constitute a breach of fiduciary duty owed to them by the defendants under Delaware law.

The purported valuation of IDS stock by Merrill Lynch is contained in Exhibit II of a report prepared by Merrill Lynch and submitted to Alleghany. [PX 252]. Exhibit II contains a heading which states, "Theoretical Approaches to Valuing Major Business Components." The defendants contend

that Merrill Lynch arrived at the figure of $43.04 by placing hypothetical values on component businesses of IDS and, as such, never engaged in a valuation of IDS assets. How Merrill Lynch determined the values for various IDS assets is not evident on the face of Exhibit II. Therefore, the court believes that a triable issue of material fact exists as to whether Exhibit II represented a valuation of IDS. Since the court has already found that the plaintiffs' other basis for its motion for partial summary judgment, the contingency fee matter, presents a triable issue of fact, the motion is denied.

■ The IDS director defendants claim that they are entitled to summary judgment on the pendent claims because their recommendation of the merger proposal to the shareholders was made in the exercise of their sound business judgment. Under Delaware law, corporate directors and officers owe stockholders a duty of uncompromising loyalty. *Guth v. Loft*, 5 A.2d 503 (Del.Supr.1939). This duty, in the corporate merger context, is one of fairness, embracing concepts of both fair dealing and fair price. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del.Supr.1983). Fair dealing involves:

... questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness [fair price] relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that

---

**5.** Similarly, defendant Mergerco denies secondary liability because it claims a lack of knowledge or substantial assistance in the alleged primary violations. Because Mergerco was formed as a wholly-owned subsidiary of Alleghany into which IDS was to be merged upon shareholder approval, the court cannot determine, on this motion for summary judgment, that aiding and abetting liability may not be imposed. Accordingly, Mergerco's motion for summary judgment is denied.

**6.** The Alleghany-Kirby defendants argue for the dismissal of the pendent claims based on the alleged invalidity of the federal claims. Since we have determined that the plaintiffs' federal claims are properly before the court, the exercise of pendent jurisdiction is appropriate because the federal and state claims "derive from a common nucleus of operative fact." *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

affect the intrinsic or inherent value of a company's stock.

*Id.*

Generally, a plaintiff carries the initial burden of calling the fairness of the transaction into question by demonstrating fraud, misrepresentation, or other acts of corporate misconduct. *Id.* at 703. Once this burden has been met, the burden is then on those relying on the vote approving the merger to show that all material facts relevant to the transaction were completely disclosed. *Id.* However, a presumption of fairness may arise where the transaction is negotiated at arm's length by committees of disinterested directors. *Id.* at 709–710, n. 7. The defendants contend that they are entitled to this presumption (which they claim the plaintiffs cannot overcome) by virtue of the Committee's evaluation of the merger proposal and the approval of the merger by a majority of IDS's disinterested shareholders. The plaintiffs, however, have raised allegations challenging the independence of the Committee.[7] Therefore, granting a judgment in favor of the IDS director defendants on the state law claims is inappropriate at this time.

Salomon, in contending that the state law claims against it should be dismissed, relies on the Chancery Court's opinion in *Weinberger. Weinberger v. UOP*, 426 A.2d 1333 (Del.Ch.1981). The *Weinberger* case arose out of a cash-out merger between UOP and its majority owner, the Signal Companies, Inc. Lehman Brothers was engaged by UOP as its investment banker. The plaintiff alleged that Lehman Brothers conspired with Signal and the UOP directors it controlled to deceive UOP's minority shareholders into approving the merger. Dismissing this allegation, the Chancery Court concluded:

> ... there is nothing to show a conspiracy between Signal, UOP and Lehman Brothers. While there is apparently no Dela-

ware case precedent on the point, it is stated as a general principle that in order to establish a civil conspiracy it is necessary to show the combination of two or more persons for an unlawful purpose, or a combination for the accomplishment of a lawful purpose by unlawful means. In addition, while the essence of the crime of conspiracy is the agreement, the essence of a civil conspiracy is damages. In other words, absent damages, there is no cause of action for a civil conspiracy. 16 Am.Jur.2d, Conspiracy § 49; 15A C.J.S. conspiracy § 1(1).

> Here there is no evidence of any understanding or overt combination between Signal, UOP and Lehman Brothers to shortchange the interests of UOP's minority.... In addition, although Lehman Brothers has been lumped together with Signal and UOP in plaintiff's allegations of breach of fiduciary duty, plaintiff has offered no authority to indicate that an investment banking firm rendering a fairness opinion as to the terms of a merger owes the same fiduciary duty to the minority shareholders as does the majority shareholder who initiated the merger as a direct result of being retained by the management of the controlled subsidiary.

426 A.2d at 1348.[8]

In light of the Chancery Court's opinion in *Weinberger*, this court is constrained to hold that Salomon, as a matter of law, cannot be held liable for a breach of fiduciary duty to the minority shareholders of IDS. However, as Salomon correctly acknowledges, *Weinberger* does not preclude, as a matter of law, the possibility of liability being imposed on it for aiding and abetting a breach of fiduciary duty. Rather, Salomon contends that aiding and abetting liability is absent because it neither had knowledge of nor substantially assisted in the alleged breach of fiduciary duty of the director defendants. As the contingency

---

7. See discussion regarding the selection process of the Committee's investment banker at pp. 437–438, *supra.*

8. The matter was never reviewed on appeal because the plaintiff dismissed Lehman Brothers from the action. 457 A.2d at 703.

fee allegation makes clear, however, the court cannot determine this issue as a matter of law.

## STANDING

██ The IDS director defendants contend that the plaintiffs lack standing to assert derivative claims on behalf of "Old IDS," i.e. the corporation which existed prior to the merger. They argue that the corporate existence of IDS was terminated as of the merger date and that any causes of action which belonged to it passed to the surviving corporation, Mergerco. Indeed, the general rule is that "a corporate merger destroys the derivative standing of former shareholders of the merged corporation from instituting or pursuing derivative claims" against that corporation. *Lewis v. Anderson*, 477 A.2d 1040, 1047 (Del.Supr. 1984) (citing *Heit v. Tenneco, Inc.*, 319 F.Supp. 884 (D.Del.1970); *Schreiber v. Carney*, 447 A.2d 17 (Del.Ch.1982); *Braasch v. Goldschmidt*, 199 A.2d 760 (Del.Ch.1964)). However, there are two recognized exceptions to this rule:

1. Where the merger itself is the subject of a claim of fraud; and

2. Where the merger is in reality a reorganization which does not affect the plaintiff's ownership of the business enterprise.

477 A.2d 1046, n. 10.

The purpose of the first exception is to prohibit the use of mergers to evade derivative claims. *Id.* In the case *sub judice*, the plaintiffs do not allege that the IDS directors perpetrated the merger for the purpose of evading derivative claims against them. Rather, they challenge the merger's fairness and, thus, the merger itself forms the basis of their derivative claims. This distinction, however, does not place the plaintiffs' claims outside of the exception to the general rule. Whether the derivative claims arise of pre-merger activities or the merger itself, the fraud suffered is substantially the same. Accordingly, we hold that the plaintiffs have standing to assert derivative claims on behalf of Old IDS.